UNITED STATES of America, Appellee,

v.

Jose Esteban CAMBINDO VALENCIA, Jose Manuel Escobar Orjuella, Federico Gonzalez, Alfonso Velasco, Mario Caicedo, Edgar Enrique Moreno Ortiz, Julio Francisco Bermudez Prado, Rafael Flores Valencia, Carmen Vivas Freddie Williams, Jesus Losada, and Rosalinda Losada, Appellants.

Nos. 759 to 763, 765, 766, 770, 771 and 840 to 842, Dockets 78–1364 and 78–1438 to 78–1448.

United States Court of Appeals, Second Circuit.

Argued April 11, 1979.

Decided Oct. 12, 1979.

On Rehearing Jan. 10, 1979.

605

Donna Claire Pendergast, Philip S. Greene, Houston, Tex., for appellant Jose Esteban Cambindo Valencia.

Irving Katcher, New York City, for appellant Jose Manuel Escobar Orjuella.

Charles E. Clayman, New York City, Dawson, Kimelman & Clayman, New York City, for appellant Federico Gonzalez.

Jonathan J. Silbermann, New York City, Federal Defender Services Unit, Legal Aid Society, for appellant Alfonso Velasco.

Albert A. Gaudelli, Flushing, N. Y., for appellant Mario Caicedo.

Theodore Krieger, New York City, for appellant Edgar Enrique Moreno Ortiz.

Julius M. Wasserstein, Lasher & Wasserstein, New York City, for appellant Julio Francisco Bermudez Prado.

Maurice Brill, New York City, for appellant Rafael Flores Valencia.

Michael Ira Asen, New York City, for appellant Carmen Vivas.

Raphael F. Scotto, New York City, for appellant Freddie Williams.

F. Louis Caraballo, Brooklyn, N. Y., for appellant Jesus Losada.

Michael G. Dowd, Kew Gardens, N. Y., for appellant Rosalinda Losada.

Barry E. Schulman, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., for the Eastern Dist. of New York, Harvey M. Stone, Mary McGowan Davis, Diane F. Giacalone, Vivian Shevitz, Asst. U. S. Attys., Brooklyn, N. Y., of counsel), for appellee.

Before OAKES and GURFEIN, Circuit Judges, and PIERCE, District Judge.*

OAKES, Circuit Judge:

This appeal is from convictions of ten defendants for conspiracy to commit narcotics offenses (Count I, 21 U.S.C. §§ 846, 963), from convictions of several for the commission of substantive narcotics offenses (Counts II–X, XII–XIII, 21 U.S.C. §§ 841, 960), and from a conviction of one defendant, Jose Esteban Cambindo Valencia (Cambindo),[1] for conducting a "continuing criminal enterprise" (Count XI, 21 U.S.C. § 848). Trial to a jury took place in the United States District Court for the Eastern District of New York, Jacob Mishler, Chief Judge. The court ruled as a matter of law

that there was involved only a single conspiracy. Consequently it did not submit to the jury the question whether there were multiple conspiracies, but merely the question whether there was a conspiracy and whether each defendant was a member of it. Because we do not agree that the issue of single/multiple conspiracy could be determined as a matter of law in this case, and because the evidence permitted the finding of several conspiracies (and in the case of some defendants demanded such a finding), we must assume that multiple conspiracies were proved. In so doing, we must decide which of the appellants may have been prejudiced by the variance between the conspiracy charged and the conspiracies proved. We find that only one narrower conspiracy was sufficiently proved by the evidence to outweigh any possible prejudice from the spillover of proof as to other conspiracies. We therefore affirm the convictions only of those appellants who were clearly linked by the evidence with that conspiracy. We also reverse the convictions of others who might be linked with that conspiracy and remand their cases for a new trial. Finally, we reverse the convictions of those appellants whose connections with the conspiracy proved were so remote that they cannot under any circumstances be held to have participated in *that* conspiracy. On the substantive charges, we reverse the convictions of all but one defendant and remand for new trials. However, we affirm all the substantive convictions of appellant Cambindo, finding that any prejudice was, in his case, harmless.

## STATEMENT OF THE CASE

### I. *Indictment and Convictions*

The superseding indictment (78 CR 106(S)) charged twenty-seven defendants in one conspiracy and charged assorted defendants in twelve substantive counts, one of which accused defendant Cambindo of

---

* Of the Southern District of New York, sitting by designation.

1. Appellants throughout are referred to by their paternal (third) names except where the maternal name is necessary to distinguish persons.

engaging in a continuing criminal enterprise (Count XI; 21 U.S.C. § 848). The conspiracy count (Count I) charged a conspiracy, occurring between approximately January, 1972, and October, 1976, violating 21 U.S.C. §§ 846 and 963, (1) to import and (2) to distribute and possess with intent to distribute substantial quantities of cocaine, as well as (3) to conceal the existence of the conspiracy. Four named coconspirators, Thomas Esposito, Lucho Plata, Louis Guillermo Moreno Serna (Moreno Serna) and Augustin Lemos, pleaded guilty (apparently to substantive counts) and do not appear. The case against another named conspirator (Juan Bautista Torres) was dismissed at the close of the Government's case. Four named coconspirators were "John Does," never arrested, and five more named were fugitives at the time of trial. One more (Zohie Perez) was convicted, but is a fugitive. The remaining twelve, all of whom appeal, were each convicted of the conspiracy count; these include Cambindo, Rafael Flores Valencia (Flores), Carmen Vivas (Vivas), Freddie Williams, Jesus Losada, and Rosalinda Losada, each of whom was also convicted of substantive counts,[2] and Federico Gonzalez (Gonzalez), Jose Manuel Escobar Orjuella (Escobar), Alfonso Velasco (Velasco), Mario Caicedo (Caicedo), Edgar Enrique Moreno Ortiz (Moreno Ortiz), and Julio Francisco Bermudez Prado (Bermudez Prado), none of whom was charged with a substantive count.

Each defendant named in a substantive count whose case went to the jury[3] was also convicted on each such count: Cambindo, named in Counts II, V, VI, X, and XI; Flores (Count IX); Vivas (Count X); Williams (Counts VII and VIII); Jesus Losada (Counts XII and XIII); and Rosalinda Losada (Counts XII and XIII). All except Vivas, Williams, and Rosalinda Losada are in custody serving their sentences, set out in the margin.[4]

Thus, there was a verdict of guilty as to every defendant on every count in which he or she was charged.

## II. *The Government's Proof*

### A. *In General*

The Government contended at trial that the alleged conspiracy involved persons who knew one another and in some cases had grown up together in Buenaventura, a Colombian port city. The Government presented evidence that the defendants utilized vessels of the Grancolombiana line (especially the Ciudad de Bogata and the Ciudad de Buenaventura) to import the cocaine to New York (although some of the transactions put in evidence relate to shipments to

---

**2.** Vivas and Williams had their conspiracy convictions set aside by Judge Mishler after the verdict, on double jeopardy grounds.

**3.** Esposito, named alone in Counts III and IV, pleaded guilty, as did Moreno Serna, named in Counts V and VI, Lucho Plata, named in Count IX, and Lemos, named in Counts V and VI.

**4.** The sentences were as follows:

Cambindo was sentenced to a 15-year term of imprisonment and a special parole term of life on each count, to run concurrently. In addition, a fine of $100,000 was imposed on Count XI and cumulative fines of $25,000 were imposed on each of the remaining counts (totaling $260,000). No sentence was imposed on Count I because it merged with Count XI.

Flores was sentenced to a three-year term of imprisonment and a special parole term of life on each count, to run concurrently.

Vivas was sentenced on the substantive count to a three-year term of imprisonment and a special parole term of 10 years.

Williams was sentenced to a three-year term of imprisonment and a special parole term of 10 years on each substantive count, to run concurrently.

Jesus Losada was sentenced to a 10-year term of imprisonment and a special parole term of life on each count, to run concurrently.

Rosalinda Losada was sentenced to a three-year term of imprisonment and a special parole term of 15 years on each count, to run concurrently.

Gonzalez was sentenced to a 15-year term of imprisonment and a special parole term of life; Escobar was sentenced to a 10-year term of imprisonment and a special parole term of life; Velasco was sentenced to a 10-year term of imprisonment and a special parole term of life; Mario Caicedo was sentenced to a five-year term of imprisonment and a special parole term of life; Moreno Ortiz was sentenced to a 12-year term of imprisonment and a special parole term of life; and Bermudez Prado was sentenced to a 10-year term of imprisonment and a special parole term of life.

Miami, Baltimore, Los Angeles, and San Francisco), where the ships usually docked at Pier 3 below Brooklyn Heights or at the Bush Terminal in Brooklyn. These defendants, according to the Government, principally used the same general methods to remove the cocaine from the ships—*viz.*, couriers carrying it on their bodies off the ship or seamen lowering the cocaine overboard to waiting "swimmers" who would enter the East River at the base of the Brooklyn Bridge (or other points), swim downstream to the vessel, get the shipment, and then swim further to an arranged point and waiting "pick-up man." They would exchange the illegal drugs among themselves or with others, principally at the Tunnel Bar, an establishment near the Brooklyn Bridge, although there were also transactions at Red Hook Park, the La Gran Casa store, a house in Queens, another house on Amity Street in the Cobble Hill section of Brooklyn, and elsewhere in greater New York City. The Tunnel Bar, owned by appellant Gonzalez and evidently the "on-the-drug-scene" successor to the Buenaventura Social Club on Hamilton Avenue in Brooklyn, exhibited sufficient prominence in the forty-eight or so transactions described during the trial to lead the Government to refer to the alleged conspiracy on occasion as the "Tunnel Bar Conspiracy." At other times, however, it has been referred to as the Buenaventura or the Grancolombiana Conspiracy.

To clarify the myriad of individual transactions that must be recounted in detail in order to analyze the contentions of the parties, a brief listing in the nature of a cast or principal characters may be helpful. The *Suppliers/Senders* from Colombia include one Mauro, appellant Flores, defendant Alfonso Villafana (Villafana), Silvio, Juan Cambindo Rodriguez, and Ricardo Cambindo Rodriguez. *Seamen* include a "John Doe" and defendants Lemos, Jose Argoti, and Figueroa. *Traffickers/Dealers* include appellants Gonzalez, Escobar, Velasco, Mario Caicedo, Bermudez Prado, Cambindo, Moreno Ortiz, Rosalinda Losada, Jesus Losada, and defendant Ulpiano Vega. The *Body Carriers* include two longshoremen, defendant German Largacha and appellant Freddie Williams, as well as Jaime Ortiz, "Pepo" (Carlos Riascos), "Kilometer," and Alvaro Caicedo. The *Swimmers* include Government witness Pacifico Caicedo Rodriguez, Daniel Riascos, Conrado Ortiz, and defendant "El Wallo." *Pick-up Men* or *Couriers* include Government witness Moreno Serna, defendant "El Bolla," and Gillian Vargas. Government witness Emilio Rivas is a *Purchaser*, and *Local Dealers* include defendants Zohie Perez and "Lucho Plata," as well as appellant Vivas. It must be understood, however, that at various times, different characters appear in different roles: the Government witness Pacifico Caicedo Rodriguez, for example, swims, traffics, picks up, and deals; there is evidence that appellant Flores in addition to supplying also deals.

## B. Specific Proof

We have found no way to classify effectively the forty-eight or so specific transactions adduced at trial. The Government kindly furnished us postargument with flow charts purporting to show connections among the various participants, but we did not find them particularly helpful. We therefore recount, chronologically and in depth, the transactions about which the Government offered proof, taking the proof in the light most favorable to the Government.

### 1 and 2 (similar acts)

Rivas and Gonzalez; Rivas and Escobar (and Velasco).

Emilio Rivas, a former resident of Buenaventura, aware that a number of the people at the Buenaventura Social Club on Hamilton Avenue in Brooklyn did business in cocaine, testified that, in 1971, prior to the conspiracy charged, he asked several of them if he too could get in the business. About the time appellant Gonzalez opened the Tunnel Bar, Rivas asked Gonzalez to sell him small amounts of cocaine on consignment and Gonzalez did so. Rivas in turn would sell this cocaine in the Tunnel Bar and elsewhere. In 1972, as Rivas's

clientele grew, Gonzalez began to provide eighth kilograms to him at $2,000 per unit. Rivas would order and receive the cocaine from Gonzalez at the Tunnel Bar. Rivas at this time also found a second supplier at the Tunnel Bar, appellant Escobar, who also began to sell Rivas eighth kilograms of cocaine on consignment at $2,000 per unit; the transactions were often negotiated, and delivery of the cocaine made, in the Tunnel Bar. Deliveries were usually made in the toilet in the back of the 15′ × 30′ bar. As time went on, in 1972, Rivas began to receive from Escobar half kilograms of cocaine for approximately $9,000 each. Often, at Escobar's direction, Rivas would pay the appellant Velasco.

*3–6*

Pacifico Caicedo Rodriguez; here of Mario Caicedo, Escobar and Velasco again, and a theft.

In March of 1972, Pacifico Caicedo Rodriguez (Caicedo Rodriguez), another resident of Buenaventura, who in Colombia had been given the telephone number of the Tunnel Bar in Brooklyn, called it when he arrived. He soon talked to appellants Gonzalez, Mario Caicedo, Velasco, Escobar, and others in the bar about the cocaine trade. One day his opportunity came. Mario Caicedo told him that a ship was scheduled to leave at seven o'clock that evening and that there were still three pounds of cocaine on board. Mario Caicedo drove him to an apartment that appellants Escobar and Velasco maintained, but did not inhabit, across the street from the Tunnel Bar. Caicedo Rodriguez learned that Escobar and Velasco were the owners of the cocaine and that Mario Caicedo was an eager purchaser. Escobar and Velasco explained that the originally assigned "carrier" (who was to have walked off the ship with the cocaine on his body) had been unable to conceal the full load and thus left three pounds of cocaine behind.

Velasco took Caicedo Rodriguez to the ship, where a seaman handed a package of cocaine to Velasco, who handed it to Caicedo Rodriguez. Caicedo Rodriguez then walked the package off the ship in his pants. The package was then turned over to Escobar and Velasco in front of the Tunnel Bar. The next day at Escobar's and Velasco's apartment, Caicedo Rodriguez was paid $1,500. Also present was appellant Mario Caicedo.

At some time thereafter Caicedo Rodriguez, who was taking marijuana off a Grancolombiana ship, was informed by Escobar that, on the same ship, he had thirty kilograms of cocaine. Caicedo Rodriguez offered to remove this cocaine, but Escobar Orjuella told him that Pepo was going to do that. Later, Pepo brought the cocaine to Caicedo Rodriguez's apartment and asked him to guard it for a week. Why Caicedo Rodriguez was entrusted with this much cocaine does not appear. According to his testimony, however, at the end of the week Escobar arrived and took the thirty kilograms of cocaine.

Caicedo Rodriguez later met with the appellant Gonzalez, Pepo, Jaime Ortiz, and "Kilometer." Gonzalez told them that there was a load of approximately three kilograms of cocaine on a Grancolombiana ship. Gonzalez agreed to hire only Pepo and Kilometer to remove the cocaine. Caicedo Rodriguez convinced Pepo and Kilometer to steal the cocaine and to tell Gonzalez that the cocaine had been lost. Caicedo Rodriguez thereafter sold the stolen cocaine to Mario Caicedo, the earlier purchaser from Escobar and Velasco, for $16,000 a kilogram. Mario Caicedo, who was originally to receive the cocaine from Federico Gonzalez, now agreed not to tell Gonzalez that Caicedo Rodriguez had sold him the cocaine.[5]

*7*

Lemos and Mario Caicedo.

Augustin Lemos [6] was a resident of Buenaventura who for some years served

---

5. Previous cases in this circuit have involved thefts among the alleged conspirators. *United States v. Bertolotti*, 529 F.2d 149, 156–59 (2d Cir. 1975).

6. Lemos was identified during the Government's case as one of the seamen who would transport the cocaine aboard the Grancolombiana ships. After the trial had been in progress

aboard the Grancolombiana ships as a steward. At the beginning of 1973, a man in Buenaventura, Libardo Cano, asked Lemos to carry 1.5 kilograms of cocaine to New York which had been smuggled on board ship. Cano told Lemos that appellant Mario Caicedo was to receive the cocaine. Lemos concealed the cocaine on the ship and, once in New York, met with Caicedo at a Brooklyn store frequented by seamen, La Gran Casa on Atlantic Avenue, where Mario Caicedo introduced him to a man named Alomia. Alomia agreed to board the ship in the early morning hours the next day to body-carry the cocaine off the ship. After the delivery was complete, Lemos met again with Mario Caicedo on Atlantic Avenue and Caicedo took him to an apartment and paid him $1,500.

8

Emilio Rivas and Cambindo.

Also in the spring of 1973, Government witness Emilio Rivas, who had done business with Gonzalez and Escobar, was introduced by a Julio Mehia to appellant Cambindo, who was apparently living at the house of Zaira Mehia. Rivas negotiated there with Cambindo to buy a half kilogram. Present also was appellant Moreno Ortiz. When Zaira Mehia vouched for Rivas's trustworthiness, Cambindo sent Moreno Ortiz to obtain a package of cocaine from the next room which he gave to Rivas. Rivas paid Cambindo $3,000 as a down payment for the drugs. Several days later Rivas paid Cambindo and Moreno Ortiz an additional $4,000. On another occasion at Zaira Mehia's house, Rivas paid $4,000 or $5,000 as a down payment on another half kilogram. Rivas gave the money to Moreno Ortiz, who in turn handed it to Cambindo, and Rivas was given another half kilogram of cocaine. Shortly thereafter, Cambindo alone sold Rivas an eighth kilogram of cocaine, this time at Rivas's home.

While it is out of chronological order, the testimony was that Rivas regularly received

for some two weeks, Lemos arrived in Philadelphia aboard the Ciudad de Bucaramanga and was arrested. Two days later he agreed to

cocaine from Cambindo through 1974 except for one period during that year when he did not. Some of this cocaine was resold to Jorge Vivas, husband of appellant Carmen Vivas, and some to appellant Flores. On one occasion Flores met Rivas in the Tunnel Bar and negotiated a deal for an eighth kilogram for $4,000 on consignment, but Flores never paid the money.

During this same time, Cambindo became a partner with Rivas and another in a meat market in uptown Manhattan.

9

Lemos and Cambindo.

In early 1973, Juan Cambindo, the brother of appellant Jose Cambindo, went to steward Lemos's home in Buenaventura. Cambindo asked Lemos to deliver approximately five kilograms of cocaine to his brother in New York, and Lemos agreed. In New York, the ship docked, as usual, at Pier 3. Lemos met with Jose Cambindo on Atlantic Avenue at La Gran Casa (where he had met Mario Caicedo). Cambindo told Lemos that a man named Luango would swim the cocaine away from the ship.

At a prearranged time in the early morning the next day, Lemos threw the cocaine wrapped in plastic down to the swimmer. But the next day Cambindo told Lemos that Luango had disappeared, that he had not received the cocaine and that Lemos would accordingly not be paid.

10

Largacha and appellant Williams, the longshoremen.

Also in early 1973, Caicedo Rodriguez (the Government witness and erstwhile swimmer/dealer) traveled home to Colombia and there contracted with a man named Mauro to bring 800 grams of cocaine to New York on the Ciudad de Bogota. When the ship arrived, he contacted a longshoreman, German Largache, who agreed to smuggle the cocaine through customs at Pier 3. At the agreed time, appellant Freddie Williams ap-

plead guilty and cooperate; one day later he testified at the trial below.

peared and removed from his socks packets of cocaine, which he gave to Caicedo Rodriguez. This cocaine was sold on consignment to Lucho Plata. One day later, Plata called Caicedo Rodriguez to say that there was money from the cocaine sales at Plata's house in Queens. When Caicedo Rodriguez arrived, Plata gave him approximately $5,000 and told him to wait because a customer for the cocaine was about to arrive. Fugitive defendant Zohie Perez walked in, purchased an "eighth" of cocaine from Plata in Caicedo Rodriguez's presence, and gave Plata $3,500, which Plata gave in turn to Caicedo Rodriguez.

*11*

Rafael Flores and Caicedo Rodriguez.

Later in 1973, Caicedo Rodriguez made a second trip to Buenaventura where he met with appellant Flores. Flores took Caicedo Rodriguez to the nearby town of Cali and introduced him to a source of cocaine. Caicedo Rodriguez purchased a pound of the substance, then hired a seaman on a Grancolombiana ship to transport it to New York and take it to Pepo and Jaime Ortiz. Caicedo Rodriguez later received $5,000 as his share of the transaction.

In August of 1973, Caicedo Rodriguez returned to the United States from Colombia and thereafter entered the marijuana business with defendant Lucho Plata. The Government does not suggest that this was part of the "single conspiracy."

*12–13*

Moreno Serna and Bermudez Prado.

In 1973, Government witness [7] Moreno Serna, as a former resident of Buenaventura, began associating with other Buenaventurans in New York and became aware that some of them were making money in the drug trade. He asked Caicedo Rodriguez, Pepo, and Batey, another swimmer, and others to get him into the business and was told that Atlantic Avenue was the hiring ground when a Grancolombiana ship was at Pier 3. When he learned that a Grancolom-

biana ship was in port, he drove down to Atlantic Avenue and ran into Pepo, who drove him to the piers. In the vicinity of Pier 3, they pulled into a cul-de-sac and Pepo called out. Batey, a man named Moises, and two or three others leaped over the customs fence with plastic bags and got into the car. Moreno Serna was then directed to drive to Pepo's home. There Pepo told Moreno Serna to return the next day to discuss payment.

The next day Pepo said that three of the kilograms of cocaine removed from the ship belonged to appellant Bermudez Prado, one to a woman, Efigenia, three to a man, Tunebares, and a final kilogram to him. Pepo explained that Moreno Serna should look to the others for payment since he (Pepo) had given Moreno Serna an entree into the cocaine business. Thereafter, Moreno Serna spoke with Bermudez Prado, who told him that, because his customers had failed to pay him, he was unable to pay. Tunebares also refused to pay Moreno Serna, but Efigenia gave him $900.

Three or four months later, Moreno Serna was approached by Batey and asked if he wished to wait for him with a car when Batey picked up a kilogram from a Grancolombiana ship on Pier 3. Moreno Serna agreed and was paid $900 by Efigenia for his assistance in picking up the kilogram of cocaine. Despite these transactions, Efigenia and Tunebares are nowhere else mentioned in the evidence and presumably are not a part of the "single conspiracy" that the Government claims.

*14–15*

Morena Serna and Cambindo; the police on the trail.

In November of 1973, Cambindo contacted Moreno Serna and told him that a Carlos Palomino, not a named conspirator, was expecting two kilos of cocaine at the pier and that he (Cambindo) was going to receive the cocaine for Palomino. Cambindo took Moreno Serna to Palomino, who agreed to pay

---

**7.** Moreno Serna, who became more or less a lieutenant of Cambindo, was subsequently to testify as to many of the latter's dealings.

him $1,000 per kilogram for being the pickup man. When the Grancolombiana ship arrived at Pier 3, Moreno Serna, Cambindo, Palomino, and Moreno Ortiz met on the Brooklyn Heights promenade overlooking Pier 3 to discuss procedures. At 3:00 a. m., Cambindo and Moreno Ortiz walked toward the pier, while Moreno Serna drove Palomino to the cul-de-sac in the pier area. Cambindo and Moreno Ortiz walked up to the car, gave the cocaine to Palomino, and then walked away. As Moreno Serna and Palomino began to drive away, they realized they were being followed by the police. Palomino threw the package from the car before the pursuing police car pulled them over. No arrests were made. Moreno Serna drove Palomino back to the area where he had thrown the cocaine but it was nowhere to be found.

The next day Palomino, Ortiz, and two others accosted Moreno Serna and ordered him into a car. Palomino accused him of having set up a fake police surveillance to steal the package. Appellant Moreno Ortiz struck Moreno Serna on the head with a gun, but Cambindo arrived, told them to stop and said Moreno Serna was not responsible. Palomino told Moreno Serna that he must pay for the lost cocaine, but Moreno Serna refused. Later Moreno Serna's car was vandalized and Cambindo told him that Palomino had done this. Cambindo confided to Morena Serna that his lady friend Zaira Mahia had been working with Government agents and that she had been the one who had tipped off the agents about the two kilograms of cocaine.

In early December, 1973, Cambindo and Moreno Serna had several conversations about raising money to purchase cocaine. Moreno Serna told Cambindo that he had saved $3,000. Cambindo stated that, with the $500 he could add, they could purchase a half kilo in Colombia. On December 9, 1973, Moreno Serna traveled to Colombia, was met by Cambindo's brothers, Juan and Ricardo, and gave the money to them. Thereafter, in February of 1974, Cambindo told Moreno Serna that a Grancolombiana ship had arrived with the half kilogram of cocaine contracted for and that the cocaine

had been unloaded, but, because it was wet, had diminished in value. A week later, Cambindo told Moreno Serna that he had sold the wet cocaine for $5,000. Moreno Serna asked for $1,200 and told Cambindo to reinvest the rest.

Cambindo sent the money to Colombia and, in March or April of 1974, another half kilogram arrived by Grancolombiana ship at Pier 3. Again, however, Cambindo said profits would be poor because the cocaine was of poor quality. This cocaine was sold for $8,000, however, and Moreno Serna received half. Cambindo advised him to hold onto the money for further investment. A month later, Cambindo told Moreno Serna that he had purchased a gypsy cab as a "front," in case he had to show he was working. Moreno Serna asked Cambindo to let him drive the gypsy cab so that he could make some money and Cambindo agreed.

*16*

The opium shipment (a similar act); Caicedo Rodriguez, Williams and Bermudez Prado.

In early 1974, a shipment of opium arrived from Colombia on board the Ciudad de Cucata. Why this new product line was entered into does not appear, but in any event the Government's evidence was that its witness Caicedo Rodriguez met on Atlantic Avenue with the seaman who brought the opium. German Largacha, the longshoreman who had previously smuggled cocaine, arranged to have appellant Freddie Williams body-carry the opium from the ship. Thereafter, Bermudez Prado drove Caicedo Rodriguez to the Bronx and introduced him to a customer for the opium, but when he took only some of it, Caicedo Rodriguez gave the rest to appellant Gonzalez to sell on consignment.

*17*

Escobar and the undercover police officer in the Tunnel Bar.

On Wednesday, February 13, 1974, Ralph Delgado, a Spanish-speaking police officer of the New York City Police Department assigned to make an undercover purchase in

the Tunnel Bar, arrived late in the evening with an informant. Delgado was introduced to appellant Escobar, and thereafter negotiated a purchase of cocaine. Escobar led Delgado to the ladies' toilet and invited him to sample the stuff. The officer asked to make a purchase. Escobar led Delgado back to the bar and then started to leave. As he did so, he spoke to two men who assumed positions as "spotters" at the Tunnel Bar's window. Moments later, Escobar came back and told the informant that he would take $550 for an ounce of cocaine. Delgado bargained for $500. Escobar walked up to the officer, handed him an ounce of cocaine in the presence of the others in the bar, and told him to check it in the toilet. Delgado went to the men's toilet, but observed three men hiding and came back. Escobar directed him to the ladies' toilet. When Delgado emerged from the toilet, he handed Escobar $500, spoke briefly with him, and told him that he would be back soon.

### 18

Here of appellant Rosalinda Losada.

Also in early 1974, appellant Rosalinda Losada, then working for a City agency, became friendly with a fellow worker, one John Canzoneri.[8] After telling Canzoneri that she had access to quantities of cocaine, Losada asked Canzoneri if he would be able to sell any. He agreed to attempt to do so and visited Rosalinda Losada at her Amity Street house in Cobble Hill. The eighth kilo was already on the living room table when Canzoneri arrived. Rosalinda Losada and Jesus Losada offered to give him the eighth to sell on consignment for $3,000. Canzoneri later sold it and returned to the Losadas' house, where they counted the proceeds together.

Thereafter, Rosalinda explained the organization of this cocaine trade to Canzoneri. According to his testimony, she stated that she obtained large amounts of cocaine from merchant seamen who would bring it

to New York and that swimmers would then smuggle it ashore. Rosalinda Losada noted that, on occasion, the shipping line employees would carry the cocaine through customs. Canzoneri was also instructed by Jesus Losada, with Rosalinda Losada acting as interpreter, that, since Canzoneri lived in Brooklyn Heights near the promenade, he was to watch for the arrival of the Ciudad de Buenaventura, the ship on which the cocaine was to arrive. One evening, Jesus Losada asked Canzoneri to drive him to the Tunnel Bar, which Rosalinda explained was the meeting place for seamen and cocaine dealers. She also said that she and Jesus used the Tunnel Bar to meet other people in the cocaine business.

### 19

Caicedo Rodriguez and Batey; Cambindo and Villafana.

In late spring or early summer of 1974, Villafana asked Caicedo Rodriquez on Atlantic Avenue in Brooklyn to swim a load of cocaine off the Ciudad de Buenaventura, and he agreed to do so even after Villafana explained that an unusual amount of surveillance on the piers had made it impossible to walk the cocaine off. The same day, Cambindo, aware that Caicedo Rodriguez was to remove the shipment for Villafana, asked him to smuggle some cocaine from the ship for him also. Caicedo Rodriguez then met with Jose Argoti, the seaman who brought the cocaine, to make arrangements. That night Caicedo Rodriguez and Batey entered the water two blocks away from the ship. Caicedo Rodriguez gave the prearranged signal with a white handkerchief, and Argoti threw the cocaine down to them. The swimmers then emerged from the water at a parking lot near the pier area. Waiting in an automobile were Villafana and appellant Bermudez Prado. Caicedo Rodriguez and Batey were paid approximately $9,000 for swimming the four and a half kilograms of cocaine.

---

**8.** Rosalinda and Jesus Losada were together indicted for a sale of cocaine. Jesus's guilty plea on a plea bargain involving Rosalinda's charges being dropped gives rise to a double jeopardy claim based on *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), discussed *infra*.

*20–21*

German Largacha and Freddie Williams, the longshoremen, deal.

Also during the spring of 1974, German Largacha approached Caicedo Rodriguez and told him that another seaman, Estupinan, had brought in a pound of cocaine on the Ciudad de Santa Marta and offered it for sale. Largacha explained that he had purchased it and that appellant Freddie Williams would carry it off the boat, but that they had no place to store it. Caicedo Rodriguez agreed to hide the stuff. Thereafter Caicedo Rodriguez waited in a car one block from the piers. Largacha and Williams pulled up in a car and gave the cocaine to Caicedo Rodriguez, who took it home and kept it for the other two.

In the summer of 1974, Largacha told Caicedo Rodriguez that another seaman had a quarter kilogram of cocaine for sale and that if Caicedo Rodriguez could sell it they could divide the profit three ways with the third share going to Williams for smuggling out the cocaine. Caicedo Rodriguez sold the cocaine for approximately $5,000 but told Largacha that he had made only $4,000. Largacha said he had paid the seaman $1,500 or $1,800. The remaining profit was divided between Caicedo Rodriguez, Largacha, and Williams.

*22*

Williams and Villafana.

Shortly thereafter Villafana approached Caicedo Rodriguez as to a shipment on board the Cuidad de Bogota docked in Bush Terminal. When Villafana asked if Caicedo Rodriguez could arrange to have the cocaine smuggled out, the latter contacted Largacha who said he would use Freddie Williams. Caicedo Rodriguez then took Williams to meet with the seaman Arturo Figueroa, and they agreed that Williams would go on the ship to receive the cocaine in the seaman's cabin. Williams then smuggled out four or five kilograms of cocaine to Caicedo Rodriguez's car. Caicedo Rodriguez paid Largacha $1,500 for each kilogram, but Largacha told him to tell Williams that he was paying only $1,000 per kilo. When subsequently questioned by Williams, Caicedo Rodriguez gave him the lower figure.

*25*

Caicedo Rodriguez, Daniel Riascos, and Cambindo.

In June of 1974 Daniel Riascos told Caicedo Rodriguez that he hád been hired by Cambindo to swim a shipment from the Ciudad de Bogota; he asked Caicedo Rodriguez to swim with him. Riascos took him to meet with Cambindo and thereafter the three met with the two seamen who had brought the cocaine. Cambindo indicated that Government witness Moreno Serna would be the pick-up man near the pier.

That night, Riascos and Caicedo Rodriguez swam to the side of the ship and pulled on a nylon cord hanging over the side. One of the seamen threw the cocaine down. They swam under the piers back to Pier 5, where Moreno Serna was waiting in a gypsy cab. The next day, June 19, 1974, Riascos and Caicedo Rodriguez went to Cambindo's residence and Caicedo Rodriguez was given cash and an eighth kilogram of cocaine in payment for his services.

*26*

Caicedo, Riascos, Cambindo, and Villafana; another theft.

Thereafter Villafana asked Caicedo Rodriguez to "swim" a shipment of cocaine at Bush Terminal from the Ciudad de Buenaventura. Villafana had contacted the seaman Lemos in Buenaventura and arranged for him to bring the shipment from Colombia. He introduced Caicedo Rodriguez to Lemos and then told Caicedo Rodriguez that Cambindo also had a shipment of cocaine on the ship, being brought by seaman Argoti, and would require assistance. All agreed that Caicedo Rodriguez would make the "swim" that evening with the assistance of Riascos. That night Riascos and Caicedo Rodriguez swam to the ship and Lemos and Argoti lowered the cocaine wrapped in plastic bags to them. Once on shore, Caicedo Rodriguez told Riascos to look for the pick-up man. While Riascos was gone, Caicedo Rodriguez quickly removed about a pound of cocaine for himself. The rest was then

of cocaine for himself. The rest was then passed to Moreno Serna who, along with one Hanry Carvajal, was there in the gypsy cab to make the pick-up. Later Riascos gave Caicedo Rodriguez his share of the money that Riascos stated had been given to him by Cambindo.

Moreno Serna and Carvajal brought the cocaine to Atlantic Avenue. Cambindo took his three kilos and Villafana therefore suffered the loss caused by Caicedo Rodriguez's theft. Later Cambindo paid $1,500 to Moreno Serna, who objected that he was to receive $3,000. Cambindo replied that the other $1,500 was going to Carvajal, due to the fact that Villafana had refused to pay Carvajal at all because of the lost cocaine.

### 27

Jesus and Rosalinda Losada sell to Caicedo Rodriguez.

During the summer of 1974 appellant Jesus Losada met with Caicedo Rodriguez and agreed to sell him an eighth kilogram of cocaine. At Losada's house on Amity Street, with Rosalinda present, Caicedo Rodriguez purchased an eighth kilo for $2,800.

### 28

Gonzalez.

During this same period, Gonzalez stated to Caicedo Rodriguez that a shipment had arrived. When Caicedo Rodriguez asked to buy part of it, Gonzalez said he thought the cocaine was bad. Caicedo Rodriguez tried it and agreed. Gonzalez then told Caicedo Rodriguez that he was going to travel to Colombia to settle accounts.

### 29–33

Moreno Serna and Cambindo.

Meanwhile, still in the summer of 1974, Cambindo told Moreno Serna that three more kilograms had arrived via the Grancolombiana lines and that he wanted Moreno Serna to use the gypsy cab to pick up the cocaine on a jetty close to the Brooklyn Bridge. Cambindo said that Caicedo Rodriguez and Daniel Riascos would come out of

the water at that point, but the two did not appear, and the delivery was made after Moreno Serna left. Cambindo did say the next day that he had received the package.

In early July, 1974, Cambindo asked Moreno Serna to take $100,000 to Colombia to buy cocaine and he agreed. Cambindo asked him to exchange the small denomination bills given to him during the sales of cocaine for large denominations. Moreno Serna did this, sometimes receiving $5,000 at one time. Normally he would exchange $500 or $1,000 at a bank at a time and then go to another bank. He had been able to exchange some $20,000 by the time Cambindo told him that he had other large-denomination bills from his drug transactions and could now send $43,000 or $44,000 to Colombia. Cambindo explained that, if he waited any longer, his brothers would be unable to put the cocaine on the ship before it left. Cambindo gave Moreno Serna the money in envelopes and a suitcase and asked him to give it to Cambindo's brothers. His brothers were to travel from their home in Buenaventura to meet with Moreno Serna at the Cali Airport. Moreno Serna received only $1,500 for his courier duties.

A month or so later Cambindo brought two seamen to Moreno Serna's home, identifying them as the seamen who had brought up the cocaine for the previous delivery involving Caicedo Rodriguez and Daniel Riascos. Another delivery was to be made. Thereafter Cambindo, Moreno Serna, the seamen, and Daniel Riascos met in Prospect Park to arrange for this delivery. Daniel Riascos was to take the cocaine away from the ship, and Moreno Serna was to pick it up. That night Moreno Serna repeatedly searched in the pier area for Daniel Riascos. Cambindo and Moreno Serna then went to a bar near the piers to look for a longshoreman to take out the cocaine. There they spoke with an American longshoreman, "Nino," [9] who told Cambindo that he would charge $4,000 per kilo to smuggle out the cocaine. When Cambindo told him that the

---

9. Defendant Thomas Esposito, known as "Nino," pleaded guilty and, the Government says, subsequently attempted to cooperate with authorities as an undercover informant but on December 7, 1978, was shot through the head. He survives.

price was too high, Nino offered a reduction to $3,500 per kilo, but was not ultimately hired.

That night Cambindo called Daniel Riascos and offered him a final opportunity to smuggle the cocaine from the ship, but warned that the ship was about to leave. On Cambindo's instructions, Moreno Serna rented a car for the pickup. Riascos was successful and Moreno Serna made the pickup. At Cambindo's house the cocaine was weighed—approximately five kilograms—and Moreno Serna was paid $5,000. When Moreno Serna told Cambindo to keep $4,000 and purchase a half kilogram of cocaine for him, Cambindo gave Moreno Serna the other $1,000 in cash.

In August of 1974, Cambindo told Moreno Serna that five kilograms of cocaine had arrived on a ship for him, but that authorities had seized it. Cambindo explained that Moreno Serna's half kilogram was included in the seizure, but if things went well, he (Cambindo) would make up the loss of the money.

Shortly thereafter, Cambindo asked Moreno Serna to accompany him on a pick-up of five kilos of cocaine and Moreno Serna, in his car, followed Cambindo to an area near the Brooklyn House of Detention. There, Pepo was waiting for them and, after a short conference with Pepo, Cambindo told Moreno Serna to wait. Later Cambindo returned and told Moreno Serna that he and the others had gotten the cocaine off the ship. When Moreno Serna asked Cambindo for his half kilogram, the latter said that it had not been his cocaine.

*34–35*

Freddie Williams is arrested with the Losadas' cocaine.

Lemos testified as to the events that led to seizure in the summer of 1974 from Freddie Williams of ten pounds of cocaine destined for the Losadas. Argoti asked Lemos, in Buenaventura, to assist him in bringing up five kilos of cocaine to New York for appellant Jesus Losada. When the Ciudad de Buenaventura docked in New York, Argoti and Lemos met with Jesus Losada near La Gran Casa. Losada told them that a longshoreman, German Largacha, would arrange the removal of the cocaine. Largacha arrived at the ship with appellant Freddie Williams. Williams, using Largacha as an interpreter, introduced himself to Lemos and Argoti and told them that he would return at 7:00 the next morning to remove the cocaine. When Williams returned to the ship in the morning, Argoti took him to the bathroom where Williams concealed the cocaine about his legs and waist and then left the ship. Williams was soon arrested with the cocaine. That afternoon, Argoti and Lemos tried to reach Jesus Losada by phone but were told by Rosalinda Losada that he was not available.

In August of 1974, Rosalinda Losada asked her friend Canzoneri to assist her in transporting some suitcases so that she could leave for Colombia the next day. Canzoneri went to her home and found her with two seamen. On the dining room table were two plastic bags. Rosalinda Losada explained that, shortly before this, a longshoreman, appellant Freddie Williams, had been arrested with five kilograms of cocaine he had been bringing to Jesus Losada.[10] She also said that another longshoreman, Williams's friend German Largacha,

10. On August 15, 1974, as Lemos gave Jesus Losada's 10 pounds of cocaine to Freddie Williams, agents of the Drug Enforcement Administration were watching from the Brooklyn Heights promenade. At approximately 7:20 a.m., Williams came down from the pier area and weaved his way through the parking lot past the guard shack on Pier 3. He got to the street despite the noticeable bulges about his clothing from the cocaine. Looking about as he walked, Williams began walking toward a municipal garage in the area. He was joined by a second individual and together they entered the garage. Williams placed the cocaine in a red Pontiac and left the area. A short time later, Williams returned to the car and opened the truck where the cocaine, wrapped in plastic, had been placed in shopping bags. As he did so, he was arrested. After being advised of his rights, Williams made a false exculpatory statement. A short while later, Williams stated that the earlier story was not true. Reminded of his rights, he stated that he and German Largacha had been hired to take five kilograms of cocaine off the Ciudad de Buenaventura for $1,500 per kilogram.

had fled to Colombia. Jesus Losada had left for Colombia to discuss the loss with the supplier. Rosalinda was joining him to participate in the negotiations. The kilo and one-half on the table had been taken by the seamen off a ship in Baltimore. Rosalinda asked Canzoneri to sell the cocaine on consignment and he agreed, with the price to be $37,000. Canzoneri indicated that it did not appear to be of good quality. Despite Rosalinda's chemical tests, the substance proved to be lidocaine, and Canzoneri was unable to sell it. It was a sale of some of this substance to an undercover agent that led to Canzoneri's arrest. See note 8, supra.

*36*

Caicedo Rodriguez and Villafana: Miami.

In September, 1974, Villafana told Caicedo Rodriguez that he had cocaine on the Ciudad de Bogota, but that he had been unable to remove it because of increased customs surveillance. Caicedo Rodriguez told Villafana that he too was expecting 800 grams of cocaine on the ship. They agreed that Caicedo Rodriguez would try to smuggle the cocaine off the ship when it later docked in Miami. Caicedo Rodriguez flew to Miami and met with seaman Arturo Figueroa, who was carrying Villafana's cocaine, and with seaman Segundo Caicedo, who had Caicedo Rodriguez's cocaine. Figueroa refused to give Villafana's cocaine to Caicedo Rodriguez unless Villafana came to Miami, but he agreed to body-carry past customs the cocaine brought by Segundo Caicedo for Caicedo Rodriguez. Caicedo Rodriguez received the 800 grams of cocaine in Miami and brought it to New York, where he "cut" it to make a kilogram. Part of this kilo was sold to Lucho Plata and part to Rafael Flores.

*37*

Caicedo Rodriguez and Vega, Bermudez Prado and Moreno Ortiz.

The same month Ulpiano Vega, a fugitive defendant, stated to Caicedo Rodriguez that he also had a shipment on the Ciudad de Bogota, but that he was going to have his shipment taken off in Baltimore because conditions there made smuggling easier.

Caicedo Rodriguez suggested that he might take the shipment off but Vega refused, stating that Moreno Ortiz and Bermudez Prado were his partners in this venture and that they had already contracted with someone else to remove the cocaine.

The next month, according to Caicedo Rodriguez, Vega and Moreno Ortiz, while seated together in the Tunnel Bar, told him that they had eight or nine kilos of cocaine on a ship heading to Baltimore and that there was more cocaine on the ship for others. On October 10, 1974, Caicedo Rodriguez, Victor Serrano, and two men who Caicedo Rodriguez later learned were undercover agents drove to Baltimore to steal the shipment, but the scheme failed because the shipment had already been seized by Government agents.

*39*

Cambindo now sends $100,000 to Colombia.

In September, 1974, when Cambindo told Moreno Serna that he was thinking of sending $100,000 to Colombia, Moreno Serna proposed that his wife act as the courier. Moreno Serna soon began receiving from Cambindo the usual small-denomination bills and, as before, he exchanged those bills at banks for larger denominations. While Moreno Serna exchanged approximately $40,000 in all, he was still exchanging bills up to the last minute before his wife was scheduled to board the plane, and she missed the flight. The next day, Cambindo sent $100,000 with Moreno Serna's wife to Colombia.

*40*

More of Baltimore: Cambindo and Moreno Serna.

In October, 1974, Cambindo informed Moreno Serna that a Silvio, who had come from Colombia, had five kilograms for him aboard the Ciudad de Bogota in Baltimore. Cambindo asked Moreno Serna to go to Baltimore to unload the ship.

Silvio, Cambindo, Moreno Serna, and others drove to Baltimore in a car rented by Moreno Serna. When the ship arrived, they

were unable to contact the seaman; the shipment had been seized and the joint venturers returned to New York. That same day, Caicedo Rodriguez and the undercover agents had traveled to Baltimore to steal cocaine from Vega, Bermudez Prado and Moreno Ortiz (see # 38).

*41*

Cambindo and Bermudez Prado; another chase.

Subsequently, one night when Moreno Serna was in Cambindo's apartment, he received a call from Daniel Riascos who asked for Cambindo and stated that, together with Cambindo and Bermudez Prado, he had been trying to "take out" cocaine that night and that they had been followed. Later that morning Cambindo told Moreno Serna that Bermudez Prado and he had been chased by the police, but that he (Cambindo) had managed to escape.

*42*

Back to Rosalinda Losada and her "partners"; also Bermudez Prado.

In 1974 Jennie Valdes, a Government witness and Amity Street neighbor of Rosalinda and Jesus Losada, was living with Marcelino Fuentes, a drug dealer. One night Rosalinda went to Valdes's house to ask Fuentes to sell cocaine for her. Jesus and Rosalinda had had a fight and the former had taken all the latter's customers. When Fuentes agreed, Rosalinda returned with an ounce of cocaine for Fuentes to sell on consignment. The next day Fuentes paid Rosalinda Losada $600. Thereafter, for a period of two months, Rosalinda Losada supplied cocaine to Fuentes weekly. In the course of their dealings, Rosalinda assured Fuentes that her sources of supply were excellent, explaining that she and Jesus were partners with, and had received their cocaine from, Cambindo, Bermudez Prado, Gonzalez, Moreno Ortiz, and Villafana. Rosalinda also explained that the cocaine was obtained from the ships at Pier 3 through the use of swimmers or longshoremen.

11. *See* episode # 8, *supra.*

On one occasion at the end of 1974, Valdes escorted Losada's son to Losada's home where, again on the kitchen table in plain view, Valdes saw approximately a kilo of cocaine. The telephone rang and Rosalinda Losada asked the person on the other end when he was going to come over and cut the cocaine. Rosalinda Losada addressed the caller as "Julio" and "Boca Puta," which was a nickname for appellant Bermudez Prado.

*43–44*

Cambindo, the Meat Market and another $70,000 to Colombia.

Once in late 1974, Moreno Serna met Emilio Rivas at Cambindo's house. Rivas left and then Cambindo told Moreno Serna that he had just sold one kilo of cocaine to Rivas and had bought a share in a meat market [11] from him. In February of 1975 Moreno Serna told Cambindo that his sister planned to travel to Colombia. Cambindo indicated that he might have a shipment of $100,000 for her to carry to Colombia. Again, Moreno exchanged approximately $40,000 from small bills to large. When his sister left, Cambindo handed her $70,000 to give to his brothers, Juan and Ricardo, in Colombia.

*45*

Cambindo in Los Angeles.

Soon thereafter, Cambindo asked Moreno Serna to go with him to the West Coast in connection with a cocaine shipment. Cambindo and Moreno Serna, their spouses, and Alvaro Caicedo flew to Los Angeles using tickets purchased by Cambindo. Alvaro Caicedo was to body-carry the cocaine off the Grancolombiana ship and Moreno Serna was to be the pick-up man.

When the ship arrived, Cambindo instructed Moreno Serna to go on board to look for Lemos [12] and the latter said that he would meet Cambindo on shore in two hours. At the appointed time Cambindo, Lemos, Moreno Serna, and Alvaro Caicedo met in a car in Long Beach and Alvaro

12. Lemos testified that Cambindo's brother Juan had arranged to have him deliver the cocaine, some six kilograms worth.

Caicedo and Moreno Serna boarded the ship posing as souvenir merchants. Alvaro Caicedo and Moreno Serna then left the ship and drove to the hotel at which Cambindo was waiting, whereupon Alvaro Caicedo gave Cambindo some cocaine. Cambindo cleaned the packages, covered with oil, and placed them in his luggage. The following day Moreno Serna and Alvaro Caicedo carried the cocaine to the airport and everyone flew home. The bags were taken to Alvaro Caicedo's house and then to Cambindo's home. Subsequently, Cambindo was to tell Moreno Serna that Alvaro Caicedo was too impatient for his money. Later Cambindo told Moreno Serna that he would be given $5,000 for his role in the delivery of the cocaine. Moreno Serna asked that Cambindo credit that amount plus $4,000 toward a kilogram of cocaine and Cambindo gave Moreno Serna $700 and a kilogram of cocaine for $9,000.

*46*

Cambindo and Moreno Serna—San Francisco.

In May of 1975 Cambindo told Moreno Serna that he was expecting a shipment of ten kilos, again to be delivered on the West Coast. Moreno Serna agreed to participate, but wanted to visit with a girlfriend en route. Cambindo called him on the West Coast to tell him that he was sending Alvaro Caicedo, the impatient fellow, and Alfredo Rengifo to California, and that he himself would come as soon as he heard that the ship had arrived.

Rengifo and Alvaro Caicedo arrived in California, followed by Cambindo with a woman, Maria. Calls to Grancolombiana revealed that the ship was a week late. Cambindo and Rengifo returned to New York. Thereafter, Moreno Serna was told by Grancolombiana that the ship would first dock at San Francisco. Moreno Serna was instructed by Cambindo to stay in Los Angeles, but to send Alvaro Caicedo to San Francisco. When Alvaro Caicedo later reported from San Francisco that the shipment had arrived, Moreno Serna flew there, joining Alvaro Caicedo and a man known as "El Wallo," a fugitive defendant.

The three met in San Francisco with Lemos, who during a lengthy phone call told Cambindo that, because of the quantity of cocaine involved, he wanted Cambindo's presence on the scene. Cambindo flew out and was registered as Rudolfo Moreno in the Flamingo Hotel.

The next night, one Conrado Ortiz and El Wallo, donning skindiver suits and flippers, went down to the water but returned to tell Cambindo that there were too many people in the area to make the swim. The following day Lemos came to the hotel and asked Cambindo why the swim had not been made. When Cambindo explained, Lemos told him that a number of smugglers had successfully taken out bundles of marijuana that night.

Later the same evening, Conrado Ortiz said that he wished to try to make the swim alone since El Wallo was inexperienced. Cambindo instructed Conrado Ortiz that he would park the car near the water and leave the trunk slightly opened. Conrado Ortiz was then to take the cocaine from the water, put it in the trunk, and close it. Cambindo told Moreno Serna and Alvaro Caicedo to bring bags to the pier so that they would appear to be seamen. If they saw the car trunk closed, they were then to drive away in the car. Everything went according to plan, except that after Cambindo told Moreno Serna not to bother picking up Conrado Ortiz, the latter, rather angry, came running up the street in a wet suit.

Cambindo paid Lemos $20,000 for the drugs, instructed Alvaro Caicedo and El Wallo to bring the cocaine to the airport the next morning, gave them money for airplane tickets and told them not to acknowledge that they knew him in the airport. When Alvaro Caicedo and El Wallo failed to appear, Moreno Serna and Cambindo flew to New York by themselves. Alvaro Caicedo and El Wallo had mistakenly flown on an earlier flight, but the cocaine had arrived safely.

Moreno Serna was to get the one kilogram he had previously paid for and $1,000

for each kilogram he had picked up, but finally agreed to take $9,000 minus $2,500 to be paid to Alvaro Caicedo. Cambindo was to sell Moreno Serna's kilo of cocaine.

A week later Cambindo told Moreno Serna that he had sold the kilo for $26,000 from which he deducted the $4,000 still owed him for it, $2,000 for Lemos, $2,000 for Conrado Ortiz, and $1,000 for miscellaneous expenses incurred in Colombia. He thus paid Moreno Serna $17,000. A few days later, Cambindo was arrested on a warrant in another drug case[13] in Moreno Serna's presence. Moreno Serna left New York and had no further contact with Cambindo.

*47*

Cambindo and Rivas—San Francisco revisited.

After the arrest Cambindo went to his customer and meat-market partner Emilio Rivas, who said he was still in the drug business. A few days later Cambindo told Rivas to pack a suitcase because they were going to travel. Cambindo, a man known as "El Bolla," a fugitive, and Rivas met later at Cambindo's house. They went from there to Boston, where Cambindo picked up a lady friend, and then to San Francisco. They went to the same hotel as before and Cambindo's friend checked in as "Luz Valencia." El Bolla was to locate the seaman while Rivas was to rent a car. When Rivas could not find a rental company that would accept cash rather than a credit card, Cambindo told him to buy a used car, which Cambindo paid for. Cambindo later told Rivas to act as the pick-up man.

Rivas and El Bolla drove the swimmer El Wallo to the pier area and returned one hour later. They found El Wallo in his wet suit with a package of cocaine approximately three feet long and one and one-half feet wide. The three returned to the hotel with the cocaine and gave it to Cambindo. The package was cleaned of grease and packed in El Bolla's suitcase. Rivas carried the suitcase with the cocaine and, upon arrival in New York, delivered it to Cambindo's home in Queens. Later Cambindo told Rivas that he was to receive $5,000, but agreed to give him $1,000 cash and one-eighth kilo of cocaine instead. Rivas sold the eighth to appellant Carmen Vivas, the wife of one of Rivas's long-time customers. Rivas subsequently sold her another eighth that he received from another source.[14]

In December, 1975, Cambindo told Rivas that he had begun to get his cocaine off the boats in Texas, and several months later the former moved to Houston.

*48*

Jesus Losada and "Baby."

As the final act in this scenario, on November 20, 1975, Jesus Losada and Gilliam Vargas, also known as "Baby," met with a Government informant at a bar in Brooklyn, but not the Tunnel Bar. A second meeting at 1:00 a. m. the next day was held at another bar in Brooklyn. A drug agent and the informant in a Volkswagen then set up a surveillance in a deserted lot not far from the pier, between the Brooklyn and Manhattan Bridges, in the expectation that Jesus Losada would meet a swimmer there. About 2:30 a. m., Losada and Baby drove slowly by the lot, then pulled into it, parked close to an abandoned pier and remained there for a half hour. At 3:30 a. m., they came back after first driving by slowly a couple of times. They left again, drove by the lot several times, and at 4:30 a. m. parked again. A while later the agents saw something moving across the lot; Losada pulled beside the Volkswagen and stepped from his car. The agents called out their identities and told Losada in English and Spanish to stop. Losada jumped into his car and began accelerating in the direction

---

13. The 1975 case against Cambindo was subsequently dismissed when, according to the Government, the informer who had agreed to testify disappeared.

14. The evidence regarding the second eighth was admitted as a similar act, but only after Trial Judge Mishler ruled that it was part of the conspiracy and dismissed the conspiracy charge against Vivas on double jeopardy grounds.

of one of the agents with his car. The agents began to fire shots, and Losada sped away, careened off a wall, and sped on. Back-up agents pursued the car and, some distance away, forced it to pull over. Inside were Jesus Losada and Baby, who was carrying a pistol. The swimmer was apparently not found.

## DISCUSSION

### I. *Multiple Conspiracies*

#### A. *Introduction*

Despite the prodigious literature written on the subject of single and multiple conspiracies, it remains shrouded in confusion, as evidenced through the bringing of this prosecution as well as through the rulings of the court below. The trial court, in overruling an objection against hearsay evidence testified to by Lemos, said:

The conspiracy [as] outlined in this count and as outlined by the proof in this case is so clear that you can't even think of multiple conspiracies. It is cocaine coming from Colombia. It is not cocaine coming from any part of the world. Wait now, it is cocaine coming from Gran Colombiana ships.

. . . . .

I am not required to charge on multiple conspiracy where the evidence does not show it [15] and I find as a matter of law to this point there is no evidence of any conspiracy except to the one I just referred to.

. . . . .

That's the one point that I am not concerned about. There may be many others that might give the Court of Appeals trouble, but not that one.

Again, later in another connection the court said:

The important thing is, and the central element in this conspiracy is that this was Buenaventura cocaine, brought in by Gran Colombian ships. Mind you, even if

it were another shipping line, I'd still find the same conspiracy, but it's so definite. Every shipment that was brought to the attention of the jury was a Gran Colombian ship and almost the same ships. I never heard of Ciudad de Buenaventura, Ciudad de Bogota, Ciudad de Barranquilla. I know that city from the airport, you see. There are some cases where it's shipped by plane, wasn't even done in this case.

This came by [Gran Colombian] ship to these ports. Most of the cocaine comes in to Pier 3.

All right, some of it comes into a Bush Terminal. One ship goes to San Francisco and one is diverted to Baltimore. What I am trying to say to you, Mr. Sheinberg, the motion to dismiss on the ground that multiple conspiracies are alleged or proved is denied.

The Government on appeal takes a different tack, by emphasizing the Tunnel Bar, where some but by no means all of the transactions took place, or were arranged for, and by emphasizing the Buenaventuran ancestries or connections of many of the participants. Thus,

The evidence showed that appellants and their coconspirators were members of a large-scale narcotics operation whose members were principally Colombian from Buenaventura, Colombia, a small port city on the Pacific Ocean. The conspirators relied on the ships of the Grancolombiana Steamship Line to smuggle the cocaine from Colombia to New York, Baltimore, Miami, San Francisco and Los Angeles. The cocaine was smuggled onboard these ships in Buenaventura, Colombia and concealed there by seamen hired to carry the drugs to the United States. In the early days of the conspiracy these ships would arrive at Pier 3 in Brooklyn Heights or the Bush Terminal in Brooklyn, New York.

Brief of Appellee at 4 (footnote omitted).

And, after describing similar methods of smuggling cocaine off shipboard and onto

---

**15.** The judge was correct, of course, that where only one conspiracy is alleged and proved, the defendants are not entitled to a multiple. con-spiracy charge. *United States v. Barrera*, 486 F.2d 333, 339 (2d Cir. 1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1944, 40 L.Ed.2d 291 (1974).

shore, methods by no means unique with appellants,[16] the Government asserts:

> The traffickers used the Tunnel Bar, which was located not far from the Bush Shipping Terminal (and was owned by appellant Federico Gonzalez), Red Hook Park, the La Gran Casa store, and several other locations, as meeting and dealing places. At the Tunnel Bar and the other locations, importers would hire swimmers to meet the seamen, second level dealers would meet with the importers to negotiate deals, and importers would meet with each other to pool their resources for the next shipment.

Brief of Appellee at 6.

Again,

> It is especially ironic that some of the appellants would make a multiple conspiracy claim in a case where, unlike many other narcotics conspiracy cases, almost all of the appellants knew one another, came from the same town, met with one another at the Tunnel Bar, and, in some cases, even grew up together. Over and over again, these appellants were shown to have used the same seamen, ships, couriers, swimmers, and customers, in a "concert of action." The appellants constantly interacted, and aligned and realigned among themselves; and the New York-based geographic focal points of this conspiracy were consistently repeated: the Tunnel Bar, Pier 3, Red Hook Park and La Gran Casa.

Brief of Appellee at 59 (footnote omitted).

We know of no case, however, where the boundaries of the alleged single conspiracy have been so diffuse as this one. The Government has not been able to point to one in its brief.[17] It did suggest *United States v. Moten,* 564 F.2d 620, 624–26 (2d Cir.), *cert. denied,* 434 U.S. 942, 98 S.Ct. 438, 54 L.Ed.2d 304, 959, 98 S.Ct. 489, 54 L.Ed.2d

318, 974, 98 S.Ct. 531, 54 L.Ed.2d 466 (1977), discussed below, but while that case contains some language favorable to the Government, its facts are quite different and at least the trial court there charged the question of single conspiracy as opposed to multiple conspiracies. *Id.* at 625. Thus, in order to reach a proper conclusion in this complicated case, we are required to review carefully the law on the subject of multiple conspiracy and then to apply that law to the wide-ranging facts of this case.

### B. *Case Law*

We commence, of course, with *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), and *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In *Berger,* the Court held that the proper inquiry when two conspiracies have been shown is not whether there has been a variance in proof, but whether there has been a variance affecting substantial rights, 295 U.S. at 82, 55 S.Ct. 629, thereby establishing the principle that a defendant may not successfully challenge a conviction based upon proof of multiple conspiracies when he has not been substantially prejudiced. In *Kotteakos,* there was a finding of one general conspiracy, but the Court held that, in fact, eight separate conspiracies were proved, with no connection among them other than the fact that one person, Brown, was involved in all eight. 328 U.S. at 754–55, 66 S.Ct. 1239. The Court said that the convictions would be reversed when there was a real danger that evidence concerning other defendants had resulted in what subsequently came to be called a "spillover" effect, *i. e.,* the evidence was transferred "by psychological effect, in spite of instructions for keeping separate transactions separate." *Id.* at 767, 66 S.Ct. at 1249. The trial court in *Kotteakos* was

---

**16.** For other cases involving drug smuggling by swimmers, *see United States v. Arroyo-Angulo,* 580 F.2d 1137, 1140 (2d Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978); *United States v. Schmidt,* 573 F.2d 1057, 1059 (9th Cir.), *cert. denied,* 439 U.S. 881, 99 S.Ct. 221, 58 L.Ed.2d 194 (1978).

**17.** The Government did refer in the argument on appeal to Judge Mishler's analogy of the Tunnel Bar to a "stock exchange," but relied more heavily on the interaction between the conspirators and their awareness of one another. While the "stock exchange" analogy may be apt, this does not make trading there one conspiracy as a matter of law or fact.

of the view that one conspiracy had been made out by a showing that each defendant was linked to alleged conspirator Brown in one or more transactions and that there was a similarity of purpose presented in various applications for loans. *Id.* at 768–69, 66 S.Ct. 1239. But the Supreme Court said that "[t]his view . . . obviously confuses the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character." *Id.* at 769, 66 S.Ct. at 1250. Thus, to determine whether one or multiple conspiracies are proven, *Kotteakos* directs the inquiry to whether there was a "single enterprise." [18]

In our court, *United States v. Borelli*, 336 F.2d 376 (2d Cir. 1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), is perhaps the leading earlier case on this subject. Judge Friendly's opinion in *Borelli* relied in part upon *Developments in the Law—Criminal Conspiracy*, 72 Harv.L.Rev. 920 (1959), and particularly its differentiation between use of the term "conspiracy" in the sense of an agreement or enterprise and use of it to describe the group entering into that agreement or enterprise. *See id.* at 934. Judge Friendly went on to say:

> Although it is usual and often necessary in conspiracy cases for the agreement to be proved by inference from acts, *the gist of the offense remains the agreement,* and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant.

336 F.2d at 384 (emphasis supplied). To do this, "the court must consider the degree of connection between each alleged conspirator and the enterprise as a whole, measured by the quality, frequency and duration of that conspirator's transactions and the positions held by the persons with whom he dealt." Note, *Resolution of the Multiple Conspiracies Issue Via a "Nature of the Enterprise" Analysis: The Resurrection of*

*Agreement,* 42 Brooklyn L.Rev. 243, 257 (1975).

In *United States v. Calabro*, 467 F.2d 973 (2d Cir. 1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973), the court held that the evidence clearly established one conspiracy to forge and pass bonds, money orders, and other obligations, because "[t]he method of operation, the participating individuals at the middle and upper levels, and the goals of the parties to the continuing agreement remained steady throughout." *Id.* at 982. The court went on to hold, as did *Berger, supra,* that even if two conspiracies had been shown, the test for reversible error was whether substantial rights had been affected, indicating that, absent a double jeopardy problem or a possibility of unfair surprise, the only real question of prejudice is that resulting from the admission of evidence not chargeable to the particular appellant. *Id.* at 983.

In *United States v. Bynum,* 485 F.2d 490 (2d Cir. 1973), *vacated and remanded on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), a leading drug conspiracy case, this court upheld a conviction of conspiracy for what might "be described as a vertically integrated loose-knit combination" with "each level of the operation [dependent] upon the existence of the other, and the mutual interdependence of each . . . fully understood and appreciated by the other." *Id.* at 495. In *United States v. Tramunti,* 513 F.2d 1087 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), we similarly held that "[w]hile much of the evidence did indicate that there were two spheres of operation in the narcotics conspiracy that was established, there was sufficient proof of mutual dependence and assistance to warrant treatment of the two spheres as one general business venture." *Id.* at 1106. In finding a single "loose-knit" conspiracy there, we relied on the factors of "cooperation, trust and a

---

18. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), is also the lodestar for review of nonconstitutional errors in federal criminal cases, holding that unless "the judgment was not substantially swayed" or "influenced" by the alleged error, "it is im-

possible to conclude that substantial rights were not affected." *Id.* at 765, 66 S.Ct. at 1248. *See* Note, *Harmless Error: The Need for a Uniform Standard,* 53 St. John's L.Rev. 541, 556–57 (1979).

mutual source of supply," *id.* (footnote omitted), and we approved the charge given by the trial court that proof of several separate conspiracies is not proof of the single overall conspiracy charged in the indictment unless one of the several conspiracies that are proved is the single conspiracy that the indictment charges. *Id.* at 1107.

In *United States v. Miley,* 513 F.2d 1191, 1206–07 (2d Cir.), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975), Judge Friendly, writing for the court, noted a suggestion in *Borelli, supra,* 336 F.2d at 383 & n. 2, that where the extreme links of a chain conspiracy have no reason to know that others are performing a role similar to theirs, there is more than one conspiracy, unless the evidence of the scale of the operation would permit the inference that persons at a particular level must have known that others were performing similar roles. The court went on to hold that the scale of operations in *Miley* was not that large and thus found a variance between the offense charged and the proof adduced. 513 F.2d at 1207. However, the court continued that there had been no spillover effect and hence no prejudice, since the whole trial consumed but five days and the crimes of the various appellants were not markedly different. The lack of spillover was especially clear in view of the fact that only five persons were tried and there were at most two or three conspiracies. *Id.* at 1209.

Conspiracy convictions were also upheld in *United States v. Sperling,* 506 F.2d 1323 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975), where the evidence of a single conspiracy was found to be sufficient. *Id.* at 1340. The court nevertheless admonished the Government, cautioning it against trying too many unconnected defendants in one trial charging a single conspiracy. *Id.* at 1340–41.

The cautions expressed in *Sperling* nevertheless went unheeded by the Government in *United States v. Bertolotti,* 529 F.2d 149 (2d Cir. 1975), where the court found at least four conspiracies and reversed the conspiracy convictions, without, however, dismissing the indictment. *Id.* at 156–59. The court said that it "may generally be conceded that the possibility of prejudice resulting from a variance increases with the number of defendants tried and the number of conspiracies proven." *Id.* at 156. Clear evidence of prejudice was found as to all of the defendants, based on the principle expressed in *Kotteakos, supra,* 328 U.S. at 775, 66 S.Ct. at 1253, that while they may have committed criminal acts, their guilt did not permit violation of their "right not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others   .   .   .." [19]

In *United States v. Taylor,* 562 F.2d 1345 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977), we held that a single conspiracy was sufficiently proved where there was proof of a common source of supply and of mutual dependence and assistance. *Id.* at 1351. Although the evidence showed two operations, one in New York and one in Washington, there was a consistency of personnel, method, and type of operation. *Id.* We examined the proof as to each appellant and upheld the convictions.

In *United States v. Moten, supra,* 564 F.2d at 624–26, the court held that a single conspiracy was involved in a narcotics operation, finding that the relationships involved were neither casual nor spasmodic, and that no defendant was involved simply in a single sale. *Id.* at 625. It was also held that a mere territorial separation of distributors does not necessarily establish discrete conspiracies, because all the distributors came to one Brown in New York at

---

19. In *United States v. Papa,* 533 F.2d 815 (2d Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976), this court recognized that the other side of the multiple vs. single conspiracy coin is double jeopardy. We stated that, once a defendant introduces sufficient evidence that two conspiracies alleged in separate cases were in fact one, the burden shifts to the Government to rebut a claim of double jeopardy. *Id.* at 821. *See also United States v. Mallah,* 503 F.2d 971 (2d Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

regular intervals to sell or purchase drugs. Brown was "obviously the kingpin of a single conspiracy regularly dealing with an established cast," and his activity was "central to the involvement of all." *Id.* In *Moten*, unlike the instant case, the trial court charged the question of a single conspiracy.

More recently, in *United States v. Vila*, 599 F.2d 21, 24 (2d Cir. 1979), *petition for cert. filed*, 47 U.S.L.W. 3814 (U.S. June 6, 1979), this court reaffirmed *United States v. Armedo-Sarmiento*, 545 F.2d 785, 790 (2d Cir. 1976), *cert. denied*, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977), in holding that a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations. The evidence in *Vila*, however, established a "single narcotics distribution organization with a common source of supply, a central leadership, and a consistent pattern of operation." *Id.* And most recently in *United States v. Delli Paoli*, 603 F.2d 1029 (2d Cir. 1979), *petition for cert. filed*, 48 U.S.L.W. 3025 (U.S. July 25, 1979) (No. 79–118), another narcotics case, the court upheld convictions despite claims of multiple conspiracies, where the coconspirators knew with certainty that other suppliers and dealers existed, even though they did not know the others personally. The court relied not only on *Moten, supra*, but on *Taylor, supra*.

In sum, our cases have generally upheld jury findings of a single conspiracy when we have found a sufficiency of evidence of such. When we have found a variance between the single conspiracy charged and several that have been proved at trial, we have reversed convictions only when there was a showing of substantial prejudice. *E. g., Miley, supra* (affirming convictions despite variance); *Bertolotti, supra* (reversing convictions because of showing of prejudice). This prejudice can, of course, be inferred from the circumstances of the case. *E. g., Kotteakos, supra*, 328 U.S. at 772–74.

■ At the trial level, however, it is the judge's duty to minimize further the threat of prejudicial "spillover" of evidence by charging the jury concerning multiple conspiracies whenever there is sufficient evidence to support such a conclusion from the facts. In order to promote the goal of "keeping distinct conspiracies distinct," *Kotteakos, supra*, 328 U.S. at 770, 66 S.Ct. 1239, the court should describe explicitly the possibility of several conspiracies and instruct the jury that in order to convict a given defendant, it must " 'find that he was a member of the conspiracy charged in the indictment and not some other conspiracy.' " *Tramunti, supra*, 513 F.2d at 1107; *see Taylor, supra*, 562 F.2d at 1351 ("The charge here correctly told the jurors that they had to acquit unless they found the existence of the conspiracy charged in the indictment and found that each defendant they convicted was a member of that conspiracy.").

Because we hold that a multiple conspiracy charge is required whenever several conspiracies might be inferred from the evidence offered, and because the trial judge here refused requests for such a charge, we must now look at the record to decide whether that refusal was supportable. If it was not, then we must assume on this appeal that the jury would have found multiple conspiracies if it had been given proper instructions.

C. *Multiple Conspiracies in This Case*

■ It is clear that a multiple conspiracy charge was necessary here. The Government sought to prove a single enterprise where (a) the alleged "single source of supply" was not one person, or group of persons, but a Latin American country, where coca leaves are grown and cocaine is apparently easy to obtain; and (b) where the "similar methods used" consisted of smuggling on ships, presumably as opposed to airplanes, and removal either by walking off the cocaine or throwing it overboard to waiting swimmers. Many of the coconspirators, indeed most, were Colombians, and some of them were from or had connections with the city of Buenaventura. But Buenaventura—the principal Pacific Ocean port in Colombia, serving the more populous re-

gion west of the Andes—has a population in excess of 115,000 persons.[20] Grancolombiana ships were used in the various transactions recounted in the evidence, but since those ships regularly traffic back and forth between American cities and Colombia, this is not exactly surprising. The fact that shipments were made from Buenaventura is not surprising, either, for reasons stated above.

True, the Government places emphasis upon use of the Tunnel Bar, near Grancolombiana dock facilities, where many of the same conspirators transacted some of their narcotics business; indeed, one owned the bar. Beyond this, some of them used the same seamen on the vessels to smuggle the narcotics to the United States and some of the same body-carry men or swimmers to remove the narcotics from the ships. They also sold to a few of the same distributors or retailers in New York. Although a set of facts of this kind might be enough to support a jury finding of a single conspiracy if all the actors were transactionally related or, as in *Moten, supra,* they were united into a single enterprise by a central figure, a jury clearly is not required to find such a conspiracy. When the facts are such that a jury might reasonably find *either* a single conspiracy or multiple conspiracies, then the trial judge must not limit their deliberations to a single conspiracy finding.

Indeed, it is hard to see how a single conspiracy could be inferred from any reading of these facts. Essentially, the Government appears to have presented a series of drug transactions involving various people who were sometimes joined, sometimes in competition, but never fused into a single enterprise. Thus, it becomes necessary to inquire into the possibilities of prejudice against particular defendants. In doing so, we must weigh the strength of the evidence offered to show the existence of particular conspiracies and to show the membership of each defendant in one or more of such conspiracies.

We find that we can identify only one discrete conspiracy, an enterprise organized around appellant Cambindo, that was clearly enough established by the evidence to avoid the prejudicial effects resulting from this massive trial. Unlike many of the other combinations of defendants suggested by the Government's case, which appear to have involved short-term agreements, often for only one shipment of cocaine, the "Cambindo conspiracy" lasted for years, involved many shipments, and had the structure of an ongoing, hierarchical organization. It is therefore clear that this conspiracy, unlike others that might be identified, could not have been overlooked by a jury facing such a complex and varied mass of evidence.

The strength of the evidence relating to this particular conspiracy is suggested by the fact that, at least from and after early 1973, Cambindo himself was involved as an organizer or participant in some twenty of the forty-five plus transactions described by the Government. Other actors played different roles in some of these transactions. The seamen, Lemos and Argoti, brought in shipments that were often supplied or procured in Colombia by Cambindo's two brothers. The swimmers were generally Government witness Pacifico Caicedo Rodriguez and Daniel Riascos, while the couriers and sometime partners included Moreno Ortiz, Government witness Moreno Serna, and Rivas, as well as El Bolla and possibly Carlos Riascos (Pepo). Another member of the Cambindo conspiracy would be Bermudez Prado who, at least in the 4.5 kilogram transaction of the spring of 1974 (# 19) and the November, 1974 (# 41), transaction, was evidently co-brokering with Cambindo. In addition to this core group, other defendants who participated in particular transactions also might possibly have been prosecuted as members of this conspiracy.

There are, however, other defendants, such as the traffickers Gonzalez, Escobar, Velasco, and Mario Caicedo, the dealers Rosalinda Losada and Jesus Losada, and the longshoremen Largacha and Williams, who, so far as is shown by the evidence offered, had very few connections with a Cambindo-

---

**20.** *Commercial Atlas and Marketing Guide* 600 (Rand McNally 1979).

oriented "single enterprise" conspiracy, or no connection at all. Because we have held that only one conspiracy was sufficiently established to withstand any possible prejudice, we must now proceed to examine the links between each appellant and that conspiracy, to see whether the evidence was sufficient to render their convictions proper, given the prejudicial "spillover."

### 1. The Traffickers

From what has been already said, it is clear that there was overwhelming evidence presented of Cambindo's own participation in an ongoing criminal enterprise generally centered around him. The same can be said of two other appellants who were traffickers as well as couriers—Moreno Ortiz and Bermudez Prado.

Moreno Ortiz was involved as an assistant and apparently also as a partner of Cambindo in several 1973 sales of cocaine to Emilio Rivas ( # 8). Along with Moreno Serna, Moreno Ortiz aided Cambindo when the latter agreed to arrange the delivery of some cocaine destined for a Carlos Palomino ( # # 14–15). These events, sufficient to demonstrate that Moreno Ortiz was a full-fledged participant in the Cambindo conspiracy in 1973, make irrelevant the absence of later participation by him in that conspiracy. See United States v. Vila, supra, 599 F.2d at 24 (a single conspiracy may change its membership).

■ As for Bermudez Prado, we have already noted his status as a co-broker with Cambindo in at least two transactions ( # # 19, 41). We are satisfied that this level of participation on two occasions was sufficient to establish Bermudez Prado's membership in the conspiracy.

On the other hand, while Gonzalez was involved in several transactions independent of Cambindo before 1973 ( # # 1, 2) and one opium transaction in early 1974 with Bermudez Prado ( # 16), as well as in the bad shipment involving Caicedo Rodriguez in the summer of 1974 ( # 28), there is little or nothing to link Gonzalez up with Cambindo other than his ownership of the Tunnel Bar. Since it is very doubtful that

ownership of a bar, used in effect as a "stock exchange" by assorted cocaine traffickers, is in and of itself enough to tie one figure to all transactions consummated within the premises, we conclude that no proof was adduced as to Gonzalez's connection with the Cambindo conspiracy, other than some ties in possibly independent transactions to Caicedo Rodriguez and Bermudez Prado.

■ As for Escobar, although he too participated in pre-1973 transactions ( # # 1–6) that involved Velasco and Mario Caicedo but were unconnected with Cambindo, the only later transaction occurred in February, 1974 ( # 17). It involved the sale of an ounce of cocaine to an undercover agent and was also unrelated to Cambindo. Velasco participated in no transactions after 1973 and was never connected with Cambindo before then. Mario Caicedo is no different since, although he did some business with Lemos ( # 7), he was never directly linked with Cambindo. The fact that all these traffickers used Grancolombiana ships, purchased Colombian cocaine going through the port of Buenaventura, and used swimmers or carriers to take the cocaine off the ships is not enough to show that they were all involved in a single enterprise; rather they appear to have been distinct entrepreneurs operating in the same general importing industry.

With respect to the Losadas, while they admittedly obtained cocaine from Grancolombiana ships and through contacts at the Tunnel Bar, and sold an eighth of a kilo on one occasion to Caicedo Rodriguez acting in his sometime capacity as a dealer, their only transactional ties with Cambindo were rather remote. On one occasion ( # 34), they purchased cocaine directly from Argoti and Lemos, sometime Cambindo seamen, in a transaction that also involved the longshoremen Largacha and Williams. On another occasion ( # 42), Rosalinda Losada dealt with Bermudez Prado and referred to Cambindo, as well as Prado, as one of her numerous "partners" in the cocaine business.

### 2. The Supplier

The only appellant supplier or procurer was Rafael Flores Valencia, who was involved in two transactions ( # # 8, 11), one as such and the other as a purchaser at the Tunnel Bar. In mid-1973 in Colombia, Flores introduced Caicedo Rodriguez, then advancing from swimmer to dealer, to a source in Cali, a transaction that so far as appears had nothing to do with Cambindo. Subsequently, however, Flores agreed to buy an eighth kilo from Cambindo's meat-market partner, Rivas, who had received it from Cambindo. This may be enough to tie him to the Cambindo enterprise under a proper charge, although we cannot say that it is necessarily enough to sustain his conviction as a matter of law.

### 3. The Longshoremen

Largacha and appellant Williams worked together as carriers until the latter was arrested and the former fled. They participated in a number of transactions, all involving Caicedo Rodriguez ( # # 10, 16, 20, 21, 22), but none involving Cambindo. They also worked for the Losadas in bringing Argoti-Lemos cocaine ashore on two occasions ( # # 34, 35) up to the termination of their partnership. These appear to have been adventures separate from any Cambindo enterprise.

### 4. The Dealers

In addition to Moreno Ortiz, whose activities included dealing cocaine as described above, there is Carmen Vivas. In one episode, appellant Vivas, the wife of one of Rivas's longtime customers, bought two eighths of a kilo from Rivas, Cambindo's partner ( # 47). This tie to Cambindo can hardly be characterized as conclusive.

### D. Conclusion With Respect to Conspiracy Law Issues

██ In drawing conclusions about the conspiracy charge in this case, we have so far not considered the many other claims made by appellants. Assuming the admissibility of all the evidence presented at trial, we have thus far concluded that, first, al-though the Government offered evidence of numerous conspiracies, only one, Cambindo's, was so clearly proved that any prejudicial spillover of evidence was necessarily insignificant. Focusing on individual connections with the Cambindo enterprise, we also hold, as to Cambindo himself, that the extensive proof of his deep involvement as a trafficker over the period of time referred to in the indictment involving a great many transactions ( # # 8, 9, 14, 15, 25, 26, 29–33, 39–47) was so overwhelming that the jury could not have been swayed by proof of other enterprises. The same holds true for appellants Bermudez Prado and Moreno Ortiz. The evidence as to appellants Gonzalez, Jesus Losada, and Rosalinda Losada was not of the same conclusive nature. They may, however, with proper instructions be retried in connection with the Cambindo enterprise under this indictment. So may appellant Flores, although whether the Government would be wise to try him, in view of the so-called "single act" line of cases potentially applicable to his trial on a Cambindo conspiracy charge, see, e. g., United States v. Torres, 503 F.2d 1120, 1124 (2d Cir. 1974); Note, supra, 42 Brooklyn L.Rev. at 268, is a question we need not resolve at this stage. Appellants Escobar, Mario Caicedo, and Velasco may not, however be retried under this indictment and their convictions are reversed. The Government has failed to offer any evidence linking them to the Cambindo conspiracy, and it would be improper to allow a retrial without the bringing of a new indictment that would identify the specific conspiracies charged against these defendants.

### E. Prejudicial Spillover and the Substantive Counts

██ In addition to the conspiracy charges in Count I, the Government brought other substantive charges against various defendants. Two of the present appellants, Carmen Vivas and Freddie Williams, are appealing only from substantive convictions, because their conspiracy convictions were set aside on double jeopardy grounds following the jury verdict below. Four others,

Cambindo, Rosalinda Losada, Jesus Losada, and Flores, appeal from substantive convictions as well as conspiracy convictions. We must now decide whether the prejudicial setting of this trial requires reversal of the substantive as well as the conspiracy convictions.

Appellants Vivas and Williams appear to have been twice prejudiced, not only because of the complexity of this massive prosecution, but also because they were wrongfully charged, in violation of the double jeopardy clause, with conspiracy. Their convictions are therefore reversed and remanded for a new trial that should probably be separate from any Cambindo conspiracy trial.

A new trial is also required for the substantive convictions of appellants Rosalinda Losada, Jesus Losada, and Flores. Although they may in fact have been participants in the Cambindo conspiracy, there was simply too much other evidence offered of entirely separate actions and unconnected defendants, fanning the flames of prejudicial spillover. Indeed, this conclusion is also made necessary by the rules relating to joinder of criminal defendants. Although the joinder of these appellants and their substantive charges with numerous other defendants was not initially improper, in that the indictment charged a single conspiracy and was apparently not brought in bad faith, *see United States v. Aiken,* 373 F.2d 294, 299 (2d Cir.), *cert. denied,* 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967); Fed. R.Crim.P. 8(b), these appellants are entitled to relief under Fed.R.Crim.P. 14. That rule provides remedies for prejudicial joinder, and requires this court to reverse convictions where it is clear that the trial court failed adequately to protect defendants from prejudice. *E. g., United States v. Branker,* 395 F.2d 881, 887–88 (2d Cir. 1968), *cert. denied,* 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969) ("It is obvious that as the number of counts is increased, the record becomes more complex and it is more difficult for a juror to keep the various charges against the several defendants and the testimony as to each of them separate in his mind. . . . This kind of preju-dice is particularly injurious to defendants who are charged in only a few of the many counts, who are involved in only a small proportion of the evidence, and who are linked with only one or two of their co-defendants."); C. Wright, *Federal Practice and Procedure,* § 227, at 470 (1969). *See also United States v. Turbide,* 558 F.2d 1053 (2d Cir.), *cert. denied,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); Note, *Harmless Error and Misjoinder Under the Federal Rules of Criminal Procedure: A Narrowing Division of Opinion,* 6 Hofstra L.Rev. 533 (1978).

Appellant Cambindo was charged with four specific instances of criminal activity, as well as with conspiracy and "continuing criminal enterprise." We have held that the extensive evidence proving the Cambindo conspiracy eliminates any possibility of significant prejudice with respect to the conspiracy charge. The same appears to be true of the continuing criminal enterprise charge. Nor are we compelled to treat the other substantive charges against Cambindo like those of the other appellants. Cambindo's unique status in this case—his involvement in an overwhelming portion of the total evidence presented—permits us to assume that the particular examples of criminal conduct involved here were proved against him without significant prejudicial spillover.

## II. *Other Points*

### A. *Introduction*

Until now, we have only considered the validity of appellants' conspiracy convictions in deciding whether to affirm, reverse and remand, or simply reverse the verdicts in the trial court. But appellants have individually or together raised additional points alleging errors or interposing defenses that they believe warrant reversal of their convictions. Since we have reversed outright the convictions of Escobar, Velasco, and Mario Caicedo, we need not discuss any claims made by them. However, the claims made by the other appellants must now be considered to determine their effect on our foregoing conclusions relating to the conspiracy and substantive charges.

**B.** *Appellant Cambindo*

Cambindo makes a number of other points on appeal, each of which is considered seriatim.

■ 1. *Limitations of cross-examination.* In response to continual objections by other defense counsel, counsel for Cambindo was ordered by the trial court to refrain from cross-examining witnesses as to the details of narcotics transactions at which his client was not present or in which he was not in some way directly involved. Cambindo argues that this prejudicially limited him. It is well established, however, that the district judge has broad discretion to restrict the scope of cross-examination, *United States v. Green,* 523 F.2d 229, 237 (2d Cir. 1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976), and the exercise of that discretion will not be overturned absent a showing of clear abuse, *United States v. Corr,* 543 F.2d 1042, 1051 (2d Cir. 1976). Here the court's order to Cambindo's counsel was not only proper in and of itself, but the court also permitted, in those instances where the limitation order applied, re-cross-examination by Cambindo's counsel after other defense counsel cross-examined and before the Government engaged in redirect. No showing of prejudice by virtue of inability to ask any specific question or questions is shown.

■ 2. *Denial of severance.* Cambindo argues that it was improper of the court not to sever Cambindo's trial once the scope of cross-examination was restricted to protect the interests of the other defendants. However, as noted above, no prejudice resulted from the limitation on cross-examination and therefore that limitation is irrelevant to the issue of severance.

■ 3. *The trial court's participation.* Cambindo argues that the judge actively participated in the prosecution of the case and created an atmosphere extremely prejudicial to the defendant. While a trial judge is precluded from interfering for merely partisan purposes or from conveying to the jury his disbelief of any particular witnesses, *United States v. Nazzaro,* 472

F.2d 302, 310 (2d Cir. 1973), he is not precluded from questioning witnesses to a reasonable degree in order to clarify testimony or from commenting fairly upon the evidence introduced and the inferences reasonably drawn therefrom. *United States v. Natale,* 526 F.2d 1160, 1167, 1169–70 (2d Cir. 1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976); *United States v. Tourine,* 428 F.2d 865, 869 (2d Cir. 1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971). Appellant's specific citations of judicial misconduct are not worthy of response. In fact, the record generally reflects that the court frequently acted favorably toward the defense and limited the Government on its cross-examination. This point borders on the frivolous.

4. *Hearsay evidence.* Cambindo argues that the court admitted hearsay evidence that did not fall under the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), in that certain statements were admitted into evidence prior to a decision as to the declarant's status as a conspirator. The law is well settled in this circuit that declarations that are otherwise hearsay may nevertheless be provisionally admitted, subject to eventual connection of the defendant with the conspiracy alleged, as long as the trial court is ultimately satisfied that the participation of the defendant against whom the declaration is offered has been established by a fair preponderance of the evidence independent of the hearsay utterances. *United States v. DeFillipo,* 590 F.2d 1228, 1235–36 (2d Cir. 1979) (following *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970)).

■ But appellant Cambindo raises an additional question, the resolution of which has been more assumed than fully explored in this circuit, though it was discussed in *United States v. DeFillipo, supra,* 590 F.2d at 1236 & n.12. That question is whether non-hearsay proof that the *declarant* is a coconspirator is required before his statements can be introduced as against a defendant under *United States v. Geaney, supra* (following *Glasser v. United States,* 315

U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942)).[21] *Geaney* and *Glasser* refer only to the independent proof necessary to establish that the *defendant* against whom the evidence is offered is a member of the conspiracy. Since Fed.R.Evid. 801(d)(2)(E) refers to "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy," it would appear that appellant's point, that there must be evidence *aliunde* of the *declarant's* membership in the conspiracy in addition to independent proof of the defendant's participation, is a valid one. The standard of proof required by *Geaney* and its numerous progeny to admit hearsay statements is not proof beyond a reasonable doubt, but merely proof by a fair preponderance of the evidence that the defendant is a conspirator. *See United States v. Stanchich*, 550 F.2d 1294, 1299 (2d Cir. 1977). So, too, the standard of proof is one of preponderance when the court assesses the participation of the declarant in the conspiracy, at least until we are better advised.

Cambindo specifically objects to the admission of statements made by Gonzalez, Escobar, and others, reported by Government witness Caicedo Rodriguez, to the effect that Caicedo Rodriguez might have an opportunity to enter the drug business. The judge overruled the defense's objections and instructed the jury that the statements were to be considered as against the persons who made them, presumably pursuant to the hearsay exception outlined in Fed.R.Evid. 801(d)(2)(A), and against any other accused (including Cambindo), if the Government proved "beyond a reasonable doubt" that the conspiracy charged in the

indictment existed. It is apparent from the record below that the trial judge had satisfied himself that the declarants and the parties against whom the statements were offered were proved to be members of the conspiracy by a fair preponderance of the evidence. Although Cambindo argues that the trial judge failed to make an explicit finding of sufficient independent evidence, citing *United States v. Ziegler*, 583 F.2d 77, 80–81 (2d Cir. 1978), we infer that the finding was made implicitly when the court admitted the statements over the defense's objections. *United States v. Lyles*, 593 F.2d 182, 194 n.15 (2d Cir. 1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979).

We have already noted that there were more conspiracies at work than the single Cambindo enterprise, thus calling into question this implicit finding that the declarants making the hearsay statements were in fact participants in the charged conspiracy. Nevertheless, if there was error here, it was harmless, since we do not believe that these statements had a prejudicial effect as to Cambindo; the evidence independent of these statements was sufficiently strong for us to conclude that admission of the questionable evidence could not have affected the verdict. The same can be said for the testimony of Rodriguez offering statements made by Villafana, Riascos, Vega, and others. Some of these declarants were not necessarily members of the Cambindo enterprise, which was clearly an enterprise proved by independent evidence. If the admission of their statements was therefore error,[22] no harm was done to Cambindo.

---

**21.** *See also United States v. DiPalermo*, 660 F.2d 17 at 21 (2d Cir. 1979) (quoting *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir.), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979) (" 'When in a criminal case the government seeks, under the co-conspirator rationale, to introduce as an admission the out-of-court statement of a declarant other than the defendant, the trial judge must make a preliminary determination that there is sufficient independent evidence to establish the following . . . (4) that both the declarant and the defendant participated in the conspiracy . . . .' "); *United States v. Cafaro*, 455 F.2d 323, 326 (2d Cir.), *cert. denied*, 406 U.S. 918, 92

S.Ct. 1769, 32 L.Ed.2d 117 (1972) ("[T]he threshold question is whether the Trial Judge could conclude, after all the evidence is in, that the prosecution had established the declarant's and the defendant's participation in the conspiracy 'by a fair preponderance of the evidence independent of the hearsay utterances.' ").

**22.** The admissibility of hearsay statements made by a person who was a coconspirator of the defendant in a conspiracy other than the one for which the defendant was charged is discussed in connection with the contentions of Bermudez Prado. *See* note 25 *infra*.

■ Appellant Cambindo also objects to a statement made by Gonzalez and offered through Government witness Rivas, but the court instructed the jury that this statement was admissible only against Gonzalez and not as against any other coconspirator, pursuant to Fed.R.Evid. 801(d)(2)(A), so that a *Geaney* finding was not required. Furthermore, Cambindo argues that a portion of the testimony of the witness Jennie Valdes relating hearsay statements of Rosalinda Losada was improperly admitted because the statements were "narrative" rather than made "in furtherance of the conspiracy." But those statements were made to assure Valdes and others that Rosalinda had a steady source of supply, a purpose certainly in furtherance of the conspiracy, and they were therefore admissible. *See United States v. Pardo-Bolland*, 348 F.2d 316, 324 (2d Cir.), *cert. denied*, 382 U.S. 944, 86 S.Ct. 388, 15 L.Ed.2d 353 (1965).

5. *Unlawful arrest.* Cambindo argues that the court improperly admitted evidence against him that was seized as the result of an illegal arrest in June, 1975. This point requires a brief recital of the facts elicited at the probable cause hearing preceding appellant's arrest. On April 17, 1975, agent Gerard Whitmore of the Drug Enforcement Administration obtained information from two informants to the effect that Cambindo would sell them an eighth kilo of cocaine later that day. One of the two informants, Casquette, had been shown to be reliable in previous cases through corroboration by independent sources. The procedures followed by Agent Whitmore and a fellow agent were nevertheless designed to guarantee the reliability and validity of the informants' statements and activities regarding the imminent drug transaction with Cambindo. Agent Whitmore and his colleague searched the informants, and after finding no money or narcotics on their persons, provided them with $4,800 for the purchase of the cocaine. The agents, from a parked van across the street, watched the informants enter a two-story building on Flatbush Avenue in Brooklyn,

with a store on the first floor and a single apartment on the second floor, where the sale would take place. The two proceeded upstairs to the apartment, and the agents saw one of the informants at the apartment's window.

Subsequently a red Chevrolet pulled up in front of the building with two occupants, appellant Cambindo and an unidentified Hispanic male, who then entered the building. Shortly thereafter Cambindo and his companion reappeared on the street, followed by the two informants. After Cambindo and friend drove off, the informants entered the agents' van and described how they had given Cambindo $4,500 and he had instructed them to wait at that location for his return with the cocaine. The agents searched the informants and found only $300 remaining from the original $4,800. After continued surveillance, Cambindo returned alone in the red Chevrolet at about 8:00 p. m. and he and the informant Casquette entered the building. Soon thereafter the agents observed lights on in the upstairs apartment, Cambindo and Casquette returned to the street, Cambindo drove off, and Casquette handed the agents an eighth kilo of cocaine that he said had just been given to him by Cambindo. A positive field test and subsequent laboratory tests revealed that the substance was in fact cocaine.

■ Agent Whitmore's affidavit, on the basis of which the warrant for Cambindo's arrest was issued by a United States magistrate, summarized these facts, although it failed to state information as to the cooperating informant's reliability. Appellant argues that failure to include such information resulted in a faulty affidavit upon which the magistrate could not make an independent judgment as to the commission of a crime, citing *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). But in *Aguilar* the affidavit in question presented only the bald assertion that affiants had received " 'reliable information from a credible person and do believe that . . . narcotics and narcotic parapher-

nalia are being kept at the above described premises.'" *Id.* at 109, 84 S.Ct. at 1511. Here, the affidavit described a purchase made by a "cooperating individual" who personally participated in the transaction and recited facts gathered by investigator/affiant Whitmore which effectively corroborated the information provided by that individual. This affidavit clearly met the standard of sufficiency for the issuance of a proper warrant for arrest. *See United States v. Ventresca,* 380 U.S. 102, 110–11, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Rollins,* 522 F.2d 160, 164 (2d Cir. 1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976).

Moreover, the facts were, as Judge Mishler found, sufficient to make the arrest valid even without a warrant, pursuant to 26 U.S.C. § 7607, since the circumstances gave the agents "reasonable grounds to believe that the person to be arrested has committed or is committing [a] violation." Warrantless arrests, as long as they are not effected in the defendant's home or in a place where there is an expectation of privacy, *United States v. Reed,* 572 F.2d 412, 421–22 (2d Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978), are proper if founded on probable cause, at least in the case of a felony. *Mayer v. Moeykens,* 494 F.2d 855, 858 (2d Cir.), *cert. denied,* 417 U.S. 926, 94 S.Ct. 2633, 41 L.Ed.2d 229 (1974).

■ 6. *Admission into evidence of a telephone number.* The court admitted into evidence a recorded notation of a telephone number found on Cambindo in the 1975 arrest, which notation appellant argues was hearsay evidence and thus improperly admitted. The telephone number in question was that of Government witness Emilio Rivas, and the document was admitted during the Government's rebuttal case after Cambindo had testified that he had met Rivas only twice and stated during cross-examination that he had never possessed Rivas's telephone number. DEA Agent Thomas Grieve, who participated in Cambindo's arrest, stated that he had seized in a search incident to the arrest a document on which

a telephone number was written. The agent typed the telephone number on a form used to request subscriber information from the telephone company, and headed the form with Cambindo's name. The document subsequently was either returned to Cambindo or lost. The agent testified to the accuracy of the number at the time he copied it, but said he could not remember it without the telephone request form. The trial court properly held that the telephone number was admissible as a past recollection recorded under Fed.R.Evid. 803(5), an admission that does not involve deprivation of the right of Sixth Amendment confrontation, *United States v. Smalls,* 438 F.2d 711, 714 (2d Cir.), *cert. denied,* 403 U.S. 933, 91 S.Ct. 2261, 29 L.Ed.2d 712 (1971). Furthermore, the telephone request form itself was properly admitted as secondary evidence under Fed.R.Evid. 1004(1), since there is no suggestion that the Government agents lost or destroyed the original document in bad faith. *See United States v. Covello,* 410 F.2d 536, 543 (2d Cir.), *cert. denied,* 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969); 5 J. Weinstein, *Evidence* ¶ 1004(1)[01], at 1004–07.

■ 7. *Immigration violation inquired into on cross-examination.* Cambindo argues that the court allowed the prosecutor on cross-examination of Cambindo to inquire as to extraneous offenses of Cambindo without any basis to believe that those offenses had been committed. This objection relates to Cambindo's prior immigration violation, evidence of which was properly admitted. When Cambindo was asked whether he had in his possession a "green card," that is, a legal visa to be in the United States, he replied that he could not answer the question yes or no. He went on to answer by saying that he was convinced he had a green card because he was licensed by a lawyer who took out papers that "when I was arrested I realized . . . were false." The prosecutor then asked several questions relating to those claims before any objection was raised by defense counsel, and the court ruled that further examination on the point was permissible,

instructing the jury that the questions were to bear only on the credibility of the witness and had nothing to do with the conspiracy. This was proper under *United States v. Wolf*, 561 F.2d 1376, 1381 (10th Cir. 1977), and *United States v. Bray*, 445 F.2d 178 (5th Cir.), *cert. denied*, 404 U.S. 1002, 92 S.Ct. 571, 30 L.Ed.2d 555 (1971).

■ 8. *Inquiries negating other acts of misconduct.* Cambindo also contends that other questions were asked by the prosecution without any good-faith basis. Typical of the questions objected to was "At that time you didn't have any fight with Pacifico Rodriguez, did you?" But this question was put not to show that Cambindo did have a fight with Pacifico Rodriguez, but that Pacifico Rodriguez had no animus against Cambindo. Each of the questions objected to negated the possibility of a prior act of misconduct and was therefore not prejudicial.

9. *Instructions.* Appellant argues that the court improperly instructed the jury regarding when a conspiracy exists and when a conspirator is involved in that conspiracy. We have examined these instructions and, except insofar as they charged a single conspiracy as a matter of law, do not find them improper.

## C. *Appellant Bermudez Prado*

The appellant Bermudez Prado argues that the evidence against him was insufficient to support his conviction and that he was fatally prejudiced by the introduction of hearsay statements made by certain *declarants* whose participation in the charged conspiracy was never proved by a fair preponderance of the evidence independent of the hearsay utterances. We also must determine whether the admission against Bermudez Prado of some hearsay evidence violated the more commonly invoked rule, enunciated in *Geaney, supra*, that a *defendant's* participation in the conspiracy must be shown by a fair preponderance of the evidence independent of the hearsay before it may be admitted.

The evidence offered against Bermudez Prado may be divided into three categories: *first*, evidence that is admissible against appellant without *Geaney* problems but that is not probative of his participation in the Cambindo enterprise, the only conspiracy sufficiently proved to overcome the prejudicial spillover resulting from the single conspiracy charge; *second*, evidence that may or may not be probative and is admissible only if the *Geaney* preponderance test on hearsay is met; and *third*, evidence that is both probative of appellant's membership in the Cambindo conspiracy and admissible without *Geaney* problems. In the first category of evidence, Moreno Serna testified ( # # 12–13) that Pepo told him that Bermudez Prado owned three kilograms of cocaine which were part of a larger drug shipment. Pepo also stated to Moreno Serna that Bermudez Prado would pay Moreno Serna to act as driver for the swimmers bringing in the cocaine. When Moreno Serna requested payment from Bermudez Prado, the latter refused to give it, stating that he had given the cocaine to several of his customers but they had failed to pay him. Although Pepo's hearsay was admissible as a statement against the interest of an unavailable declarant,[23] pursuant to Fed.R.Evid. 804(b)(3), since the statements "so far tended to subject [Pepo] to . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true," the statements nonetheless do not connect Bermudez Prado with the Cambindo enterprise. The same is true of Bermudez Prado's statement to Moreno Serna; while it is admissible as Bermudez Prado's own statement offered against him, pursuant to Fed.R. Evid. 801(d)(2)(A), the evidence is not probative in terms of the conspiracy at issue. At the same time it is not inconsistent with the existence of the Cambindo conspiracy.

Pacifico Caicedo Rodriguez testified ( # 37) that Ulpiano Vega told him in Sep-

---

**23.** According to the Government's brief, Pepo was shot and killed while trying to swim cocaine from a ship.

tember and October, 1974, that he (Vega), and Moreno Ortiz (present during the October conversation), and Bermudez Prado were partners in a cocaine importation transaction. The statement was admissible under Fed.R.Evid. 804(b)(3), since Vega was a fugitive defendant at the time of the trial and his declaration tended to subject him to criminal liability, but it is hardly helpful in assessing appellant's role in the Cambindo conspiracy.

In the second category of evidence are coconspirator hearsay statements whose admission, pursuant to Fed.R.Evid. 801(d)(2)(E) and following the *Geaney* rule, must be contingent upon the presence of a fair preponderance of the evidence *aliunde* that the defendant was a member of the conspiracy.[24]

In this category was testimony from Moreno Serna (# 41) that Cambindo told him that the police had followed him and Bermudez Prado after they had picked up cocaine from a ship docked at Pier 3, and that while he had escaped, Bermudez Prado had been caught. A New York City police sergeant testified about the chase, the arrest of Bermudez Prado, and the recovery of some cocaine, following the sergeant's surveillance of Bermudez Prado's car at the Tunnel Bar. The hearsay statements made by Cambindo to Moreno Serna and offered against Bermudez Prado are admissible under the coconspirator exception only if both

the defendant (Bermudez Prado) and the declarant (Cambindo) are shown to be members of the conspiracy by a fair preponderance of the independent evidence. *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); *United States v. Lyles,* 593 F.2d 182, 194 (2d Cir. 1979), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). While the evidence against Cambindo clearly meets the preponderance standard, as discussed earlier, the Cambindo hearsay, though highly probative, may nevertheless not be used to bootstrap its own admission, absent a finding of independent evidence of Bermudez Prado's coparticipation. *Glasser v. United States, supra,* 315 U.S. at 75, 62 S.Ct. at 467 ("Otherwise hearsay would lift itself by its own bootstraps to the level of competent evidence.").

Jennie Valdes testified (# 42) that Rosalinda Losada commented that Bermudez Prado was one of her drug partners. Valdes also overheard Rosalinda Losada talking on the telephone, asking "Julio" and "Boca Puta," both nicknames for Bermudez Prado, when he would be coming to cut some cocaine at her house. This testimony presents the problem whether there was sufficient independent evidence that declarant Rosalinda Losada was part of the Cambindo conspiracy,[25] in addition to the ques-

---

**24.** When *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), refers to the need for the trial judge to "satisfy himself of the defendant's participation in a conspiracy on the basis of the non-hearsay evidence" and "the independent evidence free from the color shed upon it by the hearsay," it necessarily is singling out more specifically evidence that would otherwise be inadmissible hearsay were it not for the coconspirator exception, Fed.R.Evid. 801(d)(2)(E). Otherwise, all of the hearsay deemed admissible pursuant to the hearsay exception rules of Fed.R.Evid. 803 and 804 would also be ineligible for use as proof *aliunde* of a defendant's or declarant's participation in the conspiracy, surely a result not intended by the rules or the court in *Geaney, supra.*

**25.** One point not specifically discussed in the *Geaney* line of cases or in the commentaries is

whether the coconspirator exception permits admission of otherwise hearsay statements made by a declarant against a defendant, neither of whom is connected with the conspiracy actually charged or proved, but both of whom are participants in another conspiracy found to exist in the factual pattern of the case. The rationales generally advanced in support of the coconspirator exception, including the "agency" theory and the unusual need for relaxed evidentiary rules to prove conspiracies that frequently involve well-concealed concerted activities, *see generally* Davenport, *The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis,* 85 Harv.L.Rev. 1378, 1384–85 (1972), offer scant guidance. Wigmore's basic raison d'etre for hearsay exceptions, that there are satisfactory independent indicia of reliability supporting admission of the hearsay, does not apply to the coconspirator exception and therefore provides no basis for drawing any conclusion.

tion whether there was sufficient independent proof of Bermudez Prado's membership.

■ There is, however, a third category of probative and admissible testimony that includes a vital piece of evidence. Pacifico Caicedo Rodriguez testified ( # 19) that, after being approached and hired by both Villafana *and* Cambindo, he had swum *their* cocaine from a ship and delivered it to Villafana, who, along with Bermudez Prado, was waiting in a parked car near the piers. Caicedo Rodriguez was paid $8,000 or $9,000 for this deed.[26] The evidence of Bermudez Prado's presence in the car, when a quantitatively large (four and one-half kilos) amount of cocaine was delivered for Cambindo and Villafana would not necessarily be enough in and of itself to warrant his conviction for possession of the drugs. *United States v. Infanti,* 474 F.2d 522, 526 (2d Cir. 1973). Nor might it necessarily support a conviction for conspiracy if the conspiracy charged were a large, multiparty, ongoing conspiracy and this were only a single transaction that was but a "minor phase" of it, *United States v. Torres,* 503 F.2d 1120, 1124 (2d Cir. 1974), although the amount of cocaine involved makes the act qualitatively quite significant. But it is, we think, enough to warrant the admission against Bermudez Prado of the above-described hearsay evidence,[27] since this transaction represented a fair preponderance of evidence of Bermudez Prado's participation in a conspiracy with Cambindo (since Villafana was in the car on his own behalf). And evidence of Bermudez Prado's participation in the Cambindo enterprise, once admissible hearsay is included, is sufficiently overwhelming as to make the possible prejudicial effect resulting from the introduction of inadmissible hearsay against him harmless error, as we found in the case of appellant Cambindo.[28]

The language of Fed.R.Evid. 801(d)(2)(E) is also of little help, with its elliptical reference to "the conspiracy."

We are inclined to the narrower construction of the rule, limiting the admission of hearsay statements only to those made by coconspirators of the conspiracy charged or proved. In this way, the trial judge can avoid a time-consuming and potentially confusing determination, for each hearsay statement offered, of whether the declarant and party against whom the statement is offered, are members by a fair preponderance of the independent evidence not only of the conspiracy at issue but of other conspiracies neither charged nor proved. Under the narrow construction, to be sure, a temptation may be presented to widen conspiracy indictments to include any and all declarants whose statements may be useful in proving the actual conspiracy. But careful trial court supervision, coupled with proper appellate review, should be sufficient to guard against this event.

26. While there was also testimony from Caicedo Rodriguez ( # 16) that Bermudez Prado had arranged the sale of opium in the summer of 1974, evidence that the Government offered and the court admitted as a similar act, this was not directly probative of participation in the Cambindo conspiracy.

27. Judge Mishler found a fair preponderance of the independent evidence connecting Bermudez Prado to a broader, more diffuse conspiracy. *Geaney, supra,* 417 F.2d at 1120, adopts a test of "reasonable grounds" for appellate review of a trial court's decision that there was a fair preponderance of independent evidence. Since we have substantially narrowed the scope of the conspiracy from that considered by Judge Mishler, we cannot review his finding. Instead, we must make our own finding after reviewing the record.

28. Bermudez Prado, along with Rosalinda Losada, argues one further point: that he was prosecuted in violation of the Department of Justice's "*Petite* policy," *see Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960), and thus his conviction should be reversed. That policy requires a United States Attorney to seek Justice Department approval to prosecute where a state has already brought a prosecution involving the same acts. They argue that the courts can enforce the *Petite* policy. But four other circuits have held that the *Petite* policy is an internal policy that may not be enforced against the Government. *See United States v. Thompson,* 579 F.2d 1184, 1189 (10th Cir.), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978); *United States v. Wallace,* 578 F.2d 735, 740 (8th Cir.), *cert. denied,* 439 U.S. 898, 99 S.Ct. 263, 58 L.Ed.2d 246 (1978); *United States v. Nelligan,* 573 F.2d 251, 255 (5th Cir. 1978); *United States v. Hutul,* 416 F.2d 607, 626–27 (7th Cir. 1969), *cert. denied,* 396 U.S. 1007, 1012, 1024, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970).

*Rinaldi v. United States,* 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977), does not suggest a contrary conclusion. It involved a lower

### D. *Appellants Rosalinda and Jesus Losada*

Jesus and Rosalinda Losada both argue that the instant prosecution is barred through operation of the double jeopardy clause by a previous federal prosecution of them in 1975 for conspiracy to distribute cocaine between August 20 and November 5, 1974. The prior indictment alleged that the overt acts were calls and meetings between the Losadas and Canzoneri, who was Rosalinda's co-worker and sometime distributor ( # 18). That prosecution resulted in a guilty plea from Jesus and, as part of his plea bargaining agreement, the dismissal of the charges against Rosalinda. Appellants Jesus and Rosalinda argue double jeopardy grounds as to Jesus and double jeopardy and violation of the plea agreement as to Rosalinda. Although Judge Mishler recognized that the earlier charge involved a period of time covered within the instant conspiracy, he nevertheless held that there was no double jeopardy violation because, first, John Canzoneri, a charged coconspirator in the 1974 conspiracy, was not charged in the instant indictment; second, the substance dealt with earlier was lidocaine, not cocaine; and third, the lidocaine was obtained from a source of supply different from that normally used by the Losadas. The Government makes the rather remarkable argument that, because a jury was not impaneled in respect to the earlier indictment, jeopardy did not attach. Of course, however, it is axiomatic of the double jeopardy clause that jeopardy attached once Jesus's guilty plea was accepted. *See United States v. Bullock,* 579 F.2d 1116, 1118 (8th Cir.), *cert. denied,* 439 U.S. 967, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978); *United States v. Williams,* 534 F.2d 119, 120 (8th Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976); *United States v. Young,* 503 F.2d 1072, 1074 n. 5 (3d Cir. 1974); *United States v. Jerry,* 487 F.2d 600, 606 (3d Cir. 1973). Furthermore, the Government contends that Jesus's "allocution constitutes an admission by him that the plea covered only a simple sale to Canzoneri of lidocaine . . .." We do not find the same degree of clarity in the allocution as asserted by the Government, nor do we find the Government's argument dispositive of the double jeopardy claim in any event.

We therefore turn to Judge Mishler's stated reasons. Addressing first his reliance on the omission of Canzoneri in the second indictment, because of the Government's input to the grand jury in respect to the conspirators named in an indictment, the lack of similarity between conspirators in two indictments does not necessarily preclude a double jeopardy problem as to the conspirators named in both indictments. *United States v. Mallah,* 503 F.2d 971, 985–86 (2d Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

Second, as to the difference in the substance involved, Judge Mishler stated that "[t]he nature of the substance defeats the double jeopardy claim since the hallmark of [this] conspiracy . . . was cocaine imported from Buenaventura, Colombia, thus indicating that the substance traded [earlier] was not conspiratorial merchandise, but rather from a different source." But the factual difference in the substance does not necessarily mean that the sale was not part of the Losadas' participation in the Cambindo conspiracy. Jesus himself stated during his sentencing hearing that he thought the substance was cocaine; otherwise he could not have been prosecuted for a criminal act because lidocaine is apparently not a controlled substance. In addition, both the lidocaine in 1974 and the cocaine in this case originated in the same place, for although the lidocaine came to the Losadas from

court's refusal to accept the Department of Justice's motion for dismissal of a prosecution that violated the *Petite* policy. The case does not suggest that a defendant, or the court, may raise the *Petite* policy argument. *See, e. g., id.* at 26 n. 9, 31, 98 S.Ct. 81. Nor is our conclusion altered by the recent Supreme Court case of *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). There the Court held that evidence obtained in violation of the IRS's internal regulations need not be suppressed. It found that because the regulations in question were not required by either the Constitution or statute, the failure to comply with them was not a violation of due process.

Baltimore, it arrived in Baltimore from Colombia. That path was not unique to the lidocaine.

Judge Mishler's third point emphasizes the difference in the source of supply of the lidocaine, a difference he found to indicate a discrete and independent conspiracy at work. From the record, however, it is unclear exactly what was the source of the lidocaine, and who was the trafficker. We cannot say for sure whether or not the same network was involved in the lidocaine transaction without further presentation of evidence.

Since in any event we have remanded the conspiracy conviction of Jesus Losada, the trial court may reconsider his double jeopardy claim, in light of the narrowing of the conspiracy charged in this case.

If Jesus's earlier plea is found to bar prosecution of him because of double jeopardy, since concededly the plea included an agreement to drop the charges against Rosalinda, the instant prosecution of Rosalinda will also be barred. The Government argues, however, that "there is considerable foundation for the position that the 1975 bargain is a nullity because it was based, at least in part, on a deliberate misrepresentation by the defendants that Rosalinda was entirely innocent . . . ." Brief of Appellee at 103. But the Government does not tell us what that "considerable foundation" is. On reconsideration below, the Government may adduce whatever evidence it may wish to present.

### E.  *Appellant Moreno Ortiz*

■ Moreno Ortiz claims double jeopardy on the basis of a conviction in the United States District Court for the District of Maryland for the crime of importing Colombian cocaine and illegally conspiring with certain persons not named in the instant indictment on or about April 1, 1975. A Grancolombiana ship docked in Baltimore was evidently involved in the one-day transaction.

Judge Mishler relied on essentially two factors in his determination that there was no double jeopardy bar to the instant prose-

cution of Moreno Ortiz: first, none of appellant's coconspirators in the Maryland indictment was named in this indictment nor were the present coconspirators named in the Maryland indictment; and second, the only Baltimore activity in the instant case occurred seven months prior to the Baltimore conspiracy transaction. After analyzing Moreno Ortiz's role in this conspiracy and the relationship among the coconspirators, we believe the judge was correct in finding that the Baltimore conspiracy was a transaction completely separate from the Cambindo enterprise, even though it occurred during the pendency of that conspiracy. It apparently involved entirely different people, lasted only one day, embracing only one substantive crime of importation and possession, and had no apparent connection to New York. By contrast, the Baltimore activity in the instant case was planned in New York.

The Baltimore conspiracy appears a clear example of a different offense under the traditional "same evidence" test of *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). But *United States v. Papa,* 533 F.2d 815, 820 (2d Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976), and *United States v. Mallah,* 503 F.2d 971, 985 (2d Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975), make it clear that the nature of continuing, large-scale conspiracies are such that the "same evidence" test is not necessarily an unfailing predictor of double jeopardy claims. *See also United States v. DeFillipo, supra,* 590 F.2d at 1232–35. Courts must consider the locations of the two conspiracies, the activities of the particular conspirators involved, and any indication of agreement or connections between the parties. Considering these factors, as we have done above, there is no reason to conclude that the Baltimore conspiracy for which Moreno Ortiz was convicted was a part of the Cambindo enterprise.

We also note that appellant's twelve-year sentence meted out in the court below is to run concurrently with the fifteen years already received on the Maryland conviction.

## F. *Appellant Federico Gonzalez*

Appellant Gonzalez objected to three offers of similar act evidence: Rivas's testimony as to transactions before the start of the alleged conspiracy ( # 1), Pacifico Rodriguez's testimony that he gave Gonzalez opium to sell on consignment ( # 16), and the introduction, by stipulation preserving rights, of evidence of small sales of cocaine by Gonzalez in 1975. Since Gonzalez is entitled to a new trial in connection with his relationship to the Cambindo enterprise, it is unnecessary for us to comment on these claims, for we have no reason to doubt that the trial court will be able to rule readily with the assistance of the recent cases in this circuit that have spelled out when similar act evidence is admissible. *E. g., United States v. Mohel*, 604 F.2d 748, at 751–752 (2d Cir. 1979); *United States v. DeVaughn*, 601 F.2d 42 at 45 (2d Cir. 1979); *United States v. Williams*, 596 F.2d 44, 50–51 (2d Cir. 1979); *United States v. Danzey*, 594 F.2d 905, 910–15 (2d Cir. 1979); *United States v. Lyles*, 593 F.2d 182, 193–94 (2d Cir.), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. Manafzadeh*, 592 F.2d 81, 86 (2d Cir. 1979); *United States v. O'Connor*, 580 F.2d 38, 40–43 (2d Cir. 1978). *See also United States v. Halper*, 590 F.2d 422, 431–32 (2d Cir. 1978).

## G. *Appellant Rafael Flores Valencia*

Appellant Flores raises three additional arguments on appeal: (1) insufficient evidence of his guilt under the conspiracy count; (2) error in submitting the substantive count to the jury; and (3) failure to sever his case.

We have already dealt with the first claim, at least by implication. In Part I–D, *supra*, we reversed the conspiracy conviction, but remanded for retrial in connection with the Cambindo conspiracy. At the same time, we noted that the appellant Flores's links to that conspiracy *might* constitute a "single act" under *United States v. Torres, supra*, and therefore might be legally insufficient for a conspiracy conviction.

Appellant Flores also argues that Count IX, charging that he, together with "Lucho Plata" and Arturo Figueroa, "did knowingly and intentionally distribute and possess with intent to distribute a quantity of cocaine, to wit, approximately ¾ kilogram," should not have been submitted to the jury, apparently for three reasons—first, because there was no evidence that he *distributed* cocaine or aided and abetted Rodriguez's distribution; second, because there was no evidence that he aided and abetted Plata and Figueroa in the *possession* of three-fourths kilogram with intent to distribute; and third, because there was a material variance between the indictment and the proof, for appellant possessed only one-eighth kilogram. Although we have already reversed and remanded for retrial the substantive conviction of Flores at issue here on grounds of prejudicial spillover, we note that the particular attacks made by appellant are unpersuasive.

With respect to the first claim, there was no direct evidence that Flores *distributed* the one-eighth kilogram of cocaine that he received from Rodriguez. Flores can, however, be charged with this substantive offense because of his relationship with coconspirator Caicedo Rodriguez. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1481 (1946) (coconspirator's acts in furtherance of conspiracy are sufficient to support defendant's conviction of substantive offense). While we would not extend *Pinkerton* to acts of an unindicted coconspirator who is also a government agent, Caicedo Rodriguez was not such an agent at the time of the offense. To aid and abet, " 'it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." ' " *United States v. Licursi*, 525 F.2d 1164, 1167 (2d Cir. 1975). There was ample evidence of aiding and abetting to submit the question to the jury.

As to the second point, even if it is necessary also to prove *possession* with intent to distribute, again there was sufficient proof

that Flores aided and abetted Rodriguez to commit this offense. Also, Rodriguez aside, Flores's possession of such a large quantity of cocaine may have been sufficient to submit to the jury the question of intent to distribute.

Third, the variance argument is unconvincing under such cases as United States v. Knuckles, 581 F.2d 305, 311 (2d Cir.), cert. denied, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978), and United States v. Brozyna, 571 F.2d 742, 745 (2d Cir. 1978); a minor difference in the amount possessed or distributed does not affect appellant's "substantial rights." Indeed, under the aiding and abetting theory, appellant did help to "distribute" three-fourths of a kilogram, not one-eighth.

Appellant's severance argument will presumably be raised again below in the event of any retrial; we will not bind the trial court's hands in respect to it.

### H. *Appellant Carmen Vivas*

Appellant Vivas raises four points on this appeal. Her first point is that the witness Harary should not have been permitted to identify her voice on the tape (this evidence was used as a foundation to admit a tape recording of a similar act). This contention is without merit. The standard for the admissibility of an opinion as to the identity of a speaker on tape is merely that the identifier has heard the voice of the alleged speaker at any time. *United States v. Rizzo*, 492 F.2d 443, 448 (2d Cir.), *cert. denied*, 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974); *United States v. Bonanno*, 487 F.2d 654, 659 (2d Cir. 1973); Fed.R.Evid. 901(b)(5). Because Harary had heard the voice exemplar of appellant, she was competent to authenticate the tape and identify the voice on it.

In conjunction with this point, appellant argues that Harary was subsequently improperly and prejudicially qualified as an expert by the trial court. However, it is not entirely clear that Harary was qualified as an expert. She was, however, asked to describe her background in detail. In any event, the standard of review in this area is

that the decision of the district court should not be reversed unless there is a clear showing of abuse of discretion. *United States v. Bermudez*, 526 F.2d 89, 97–98 (2d Cir. 1975), *cert. denied*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). According to Fed.R. Evid. 702, "[if] specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Harary was an interpreter; one can assume she had specialized knowledge of Spanish voices and could "hear" differences in speech patterns not noticed by the non-Hispanic jury. On the other hand, voice identification is not generally considered to be an area where expertise is important. *See* Fed.R.Evid. 901(b)(5) Advisory Committee's Note ("[A]ural voice identification is not a subject of expert testimony . . . ."). Thus, there is some force to the argument that the jury could have been unduly impressed with Harary's voice identification. Although the question is a close one, we feel that it was not a clear abuse of discretion to qualify Harary as an expert if, in fact, that was done. In this connection, we note that the appropriate charge to the effect that the jury was the ultimate judge of the testimony's worth was included. Appellant Vivas's second claim—that the tape was improperly admitted as lacking foundation—falls with the first claim. Because Harary's testimony was admissible to authenticate the tape, a proper foundation was laid and the tape, which related to a prior similar transaction between Vivas and Rivas, was admissible. Any claim that the tape was not relevant would be frivolous.

Appellant also complains of the admission into evidence of a "similar act" (purchase of an eighth kilogram from Rivas) for which she had already been convicted. If this evidence is again offered at a retrial, we remain confident that the trial court will competently handle the problem under the case law.

We have already discussed in an earlier section, *see* Part I–E, *supra*, the final issue raised by appellant—her improper joinder with numerous defendants whose acts were unrelated to hers.

### I. *Points Not Discussed*

Appellants make additional arguments for reversal of their convictions. We have considered these points, but find them to be either unpersuasive or properly left to the consideration of the trial court in the event of retrial(s).

### CONCLUSION

Despite repeated admonitions by, and a few decisions of, this court, the Government here prosecuted and the court below permitted a wide-ranging, amorphous series of transactions to go the jury as a single conspiracy as a matter of law, when in fact several discrete conspiracies were proved. Not surprisingly, the jury convicted all defendants on all counts. For reasons above stated we permit certain convictions to stand—those of appellants Cambindo, Bermudez Prado, and Moreno Ortiz, a continuous single enterprise involving them having been solidly proved. We reverse, by permit retrial—on the same conspiracy as well as substantive counts—of appellants Gonzalez, Jesus Losada, Rosalinda Losada, and Flores Valencia. We reverse and remand for retrial convictions of appellants Williams and Vivas on substantive counts only. And we reverse outright the convictions of appellants Escobar, Mario Caicedo, and Velasco.

Judgment in accordance with opinion.

### ORDER ON PETITION FOR REHEARING

The Government raises two points in its petition for rehearing. The first is without merit. The cases of *United States v. Variano*, 550 F.2d 1330, 1334 (2d Cir.), *cert. denied*, 433 U.S. 912, 97 S.Ct. 2982, 53 L.Ed.2d 1097, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977), and *United States v. Aiken*, 373 F.2d 294, 299–300 (2d Cir.), *cert. denied*, 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967), do not require affirmance of the

substantive convictions of the six appellants whose substantive convictions we reversed. Four of these appellants had their conspiracy convictions reversed by this court. Two others had their conspiracy convictions dismissed by the court below after trial, on double jeopardy grounds. In such situations, *Variano* and *Aiken* require affirmance of substantive convictions unless there has been bad faith on the part of the Government or *actual prejudice*. 550 F.2d at 1334; 373 F.2d at 299–300. Because we found prejudicial "spillover" of the evidence here, we reversed the substantive convictions of these six of the appellants. *See United States v. Branker*, 395 F.2d 881, 887–88 (2d Cir. 1968), *cert. denied*, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969).

With respect to the Government's second point, involving our footnote 25, we grant the petition for rehearing to the extent of clarifying that footnote. It is hereby ordered that the second paragraph of that footnote be deleted and replaced by the following:

We are aware of the line of cases that permits coconspirator hearsay to be admitted to prove substantive counts where no conspiracy has been charged. *E.g., United States v. Doulin*, 538 F.2d 466, 471 (2d Cir.), *cert. denied*, 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 178 (1976); *United States v. Ruggiero*, 472 F.2d 599, 607 (2d Cir.), *cert. denied*, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973). One case involving an underlying conspiracy count cited these cases but, while pointing to "serious potential for prejudice in the form of confusion of issues," held that it was harmless error to admit as "similar act" evidence the vicarious admissions of a coconspirator from a later conspiracy. *United States v. Lyles*, 593 F.2d 182, 194–96 (2d Cir.), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). Obviously, where one conspiracy is charged and proof as to others adduced, the potential for prejudice may increase, the less "factually intertwined," *id.* at 194, the hearsay declaration is with the offense for which the defendant is tried.

Finally, appellant Jesus Losada has petitioned for bail or release pending a new trial in the court below. Because Losada's convictions were reversed and remanded for further proceedings below, we refer this motion to the district court for its consideration.*

* We note that by memorandum the late Judge Gurfein agreed to the foregoing in substance.